No. 83,947

ALBERT & FORESTEAN ADAMS, Individually, and as Special Administrators of the Estate of NICHELLE DENISE ADAMS, Deceased, *Appellant/Cross-appellees*, v. VIA CHRISTI REGIONAL MEDICAL CENTER, *et al.*, *Defendants*, and, LINUS OHAEBOSIM, D.O., *Appellee/Cross-appellant*.

(19 P.3d 132)

Opinion filed March 9, 2001.

*Randall E. Fisher*, of the law office of Randall E. Fisher, of Wichita, argued the cause and was on the briefs for appellants/cross-appellees.

*William Tinker, Jr.*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause and *Scott E. Sanders* and *David L. Vogel*, of the same firm were with him on the briefs for appellees/cross-appellant.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a personal injury and wrongful death action filed by Albert and Forestean Adams, the parents of Nichelle Adams, who died as a result of a ruptured ectopic pregnancy. The

parents sued St. Francis Regional Medical Center, now known as Via Christi Regional Medical Center, and Dr. Linus Ohaebosim. The parents settled all their claims against the hospital for $170,000. The parents' action against Dr. Ohaebosim proceeded to trial, and the jury returned a verdict in favor of the parents. The jury's nonpecuniary wrongful death damage award was for $1,800,000. Because the parents already had received the statutory limit on wrongful death damages as settlement proceeds from the hospital, the trial court entered no judgment against Dr. Ohaebosim for wrongful death damages. The parents appeal from the trial court's entry of judgment. Dr. Ohaebosim cross-appeals on liability issues. The case was transferred to this court pursuant to K.S.A. 20-3018(c).

In July 1992, Nichelle Adams was 22 years old and was living with her parents and her younger sister. On July 22, Mrs. Adams got home from work at approximately 8:40 p.m. to find that Nichelle had been complaining about her stomach and had gone to bed. Mrs. Adams was concerned because Nichelle generally was a very active person.

Dr. Ohaebosim, an osteopath, who had been a family practitioner for 22 years, had been the family physician for Mr. and Mrs. Adams and their three children for several years. He had a patient file on Nichelle, but he had not seen her in his office since 1988. On July 6, Nichelle completed a form for Planned Parenthood in which she answered "no" to the question "Do you have a family physician?" Dr. Ohaebosim continued to provide medical care to other members of the family. Mrs. Adams had gotten medical advice from Dr. Ohaebosim over the telephone on a number of occasions.

Until 1990, Dr. Ohaebosim included as part of his family practice the treatment of women through pregnancy, labor, and delivery. He delivered over a thousand babies. After 1990, he continued to treat pregnant women for nonpregnancy-related conditions and to make the determination for women that they were pregnant, but he referred women to other practitioners for prenatal care, labor, and delivery. Dr. Ohaebosim testified about sending a letter to his patients to advise them that he would no longer be providing

obstetrical care. He also testified that he advised all the hospitals, "I don't deliver babies any more." He further stated, "This is my notice written. I'm writing to inform you that I would cease delivering babies on January, 1990, on the 1st of January, 1990." Mrs. Adams testified that she did not receive a letter from the doctor advising that he no longer offered obstetrical care. She was unaware that Dr. Ohaebosim had eliminated obstetrical care from his practice.

At approximately 9 p.m. on July 22, Mrs. Adams called Dr. Ohaebosim. She got his answering service, and then the doctor called Mrs. Adams right back. She told Dr. Ohaebosim that Nichelle was 5 to 8 weeks pregnant and was experiencing abdominal pain. Mrs. Adams later told a doctor at the hospital that she mentioned shortness of breath to Dr. Ohaebosim in the telephone conversation, but Dr. Ohaebosim later denied it, and at the time of trial Mrs. Adams could not remember telling him anything other than Nichelle was pregnant and had abdominal pain.

Dr. Ohaebosim testified that 8 weeks is the typical time when an ectopic pregnancy becomes symptomatic because the fetus becomes too large for the fallopian tube. When Mrs. Adams told Dr. Ohaebosim of Nichelle's condition, he did not suspect that Nichelle might have an ectopic pregnancy.

Based on his previous experiences with Mrs. Adams, he expected her to be thorough and matter-of-fact in describing whatever medical condition she called him about. According to Dr. Ohaebosim, Mrs. Adams did not express urgency or serious concern when she called him on July 22.

Dr. Ohaebosim testified that he told Mrs. Adams that abdominal pain is not abnormal during pregnancy but to take Nichelle to the emergency room if she got any worse. He also told her to have Nichelle see a doctor the next day. Mrs. Adams testified that Dr. Ohaebosim did not mention taking Nichelle to the emergency room, but that he did say to bring her into his office the next day. Dr. Ohaebosim and Mrs. Adams agreed that he did not ask her any questions about Nichelle's condition.

At approximately midnight, Mrs. Adams drove Nichelle to the hospital, where she was admitted into the emergency room at 12:25

a.m. on July 23. By the time Nichelle was taken into an examining room, she was agitated and thrashing around. While Mrs. Adams was alone with Nichelle in the examination room, Nichelle vomited. Mrs. Adams called for help, and, when hospital personnel took over Nichelle's care, Mrs. Adams was taken to a nursing station to call her husband. Mrs. Adams testified that she was taken by surprise because she "just didn't expect all this to unfold. It just unfolded so fast." Before her husband arrived at the hospital, Mrs. Adams was told that Nichelle had gone into cardiac arrest. Later she was told that Nichelle was being taken to surgery.

Dr. Ohaebosim was not contacted with regard to Nichelle until approximately 4 p.m. on July 23. He immediately went to the hospital. Nichelle was on life support systems and nonreactive to the light Dr. Ohaebosim shined in her eyes. He discussed Nichelle's condition with her family, and at approximately 6:30 p.m. she died after being removed from the support systems pursuant to her family's decision. There was evidence that Nichelle might have lived if she had received medical care at 9 or 9:30 p.m. on July 22, instead of after midnight.

Mr. and Mrs. Adams, individually and as administrators of the estate of Nichelle Adams, sued St. Francis Regional Medical Center and Dr. Ohaebosim. Mr. and Mrs. Adams settled with the hospital for $170,000. They proceeded to trial against Dr. Ohaebosim. The jury found Dr. Ohaebosim 90% at fault and the hospital 10% at fault. The jury found that a physician-patient relationship existed between Nichelle Adams and Dr. Ohaebosim on July 22, 1992. The jury determined the following damages:

Forestean and Albert Adams' non-economic loss to date: $500,000.
Forestean and Albert Adams' future non-economic loss: $500,000.
Forestean and Albert Adams' economic loss: $15,000.
Estate of Nichelle Adams' non-economic loss between 9 p.m. July 22, 1992 and Nichelle Adams' death: $1,000,000.

The total damage award was $2,015,000. $200,000 of the award to Nichelle's estate was for pain and suffering. In 1992, K.S.A. 60-1903(a) placed a cap of $100,000 nonpecuniary damages in a wrongful death action.

The trial court's journal entry of judgment states:

"The plaintiffs Albert and Forestean Adams are entitled to recover a maximum of $100,000 for non-economic damages and $15,000 for economic damages for their wrongful death cause of action. The plaintiffs having previously recovered $170,000 for their wrongful death cause of action, the plaintiffs take no judgment against the defendant for their wrongful death claim. The jury having awarded the Estate of Nichelle Adams $200,000 for pain and suffering prior to her death, after application of the jury's findings of fault, the Estate of Nichelle Adams is entitled to Judgment against the defendant in the amount of $180,000."

We first determine if the district court erred in denying recovery of any wrongful death damages from Dr. Ohaebosim. The particular question presented by this case has not yet been considered by a Kansas appellate court. It involves statutory interpretation and is a question of law over which the court has unlimited review. *Sebelius v. LaFaver*, 269 Kan. 918, 920, 9 P.3d 1260 (2000).

The parents' position is that extension of settled comparative negligence principles to their circumstances requires reversal of the trial court's ruling. In *Geier v. Wikel*, 4 Kan. App. 2d 188, 603 P.2d 1028 (1979), the court considered what effect a claimant's release of one person or entity would have on claimant's right to recover from others. One Geier son was killed and one injured in a car-train collision. The Geiers gave unconditional releases to the railway company. Wikel, the driver of the car, filed a motion for summary judgment, which the trial court granted on the common-law joint and several liability theory that the release of one joint tortfeasor releases all. The decision in *Geier* dispelled the notion that the concept of joint and several liability survived the legislature's enactment of the comparative negligence statute, K.S.A. 60-258a. The Court of Appeals declared:

"An injured party whose claim for damages is exclusively subject to the Kansas comparative negligence statute may now settle with any person or entity whose fault may have contributed to the injuries without that settlement in any way affecting his or her right to recover from any other party liable under the act. The injured party is entitled to keep the advantage of his or her bargaining, just as he or she must live with an inadequate settlement should the jury determine larger damages or a larger proportion of fault than the injured party anticipated when the settlement was reached. It follows that the type of release given will have no effect on any party not specifically named in the instrument." 4 Kan. App. 2d at 190.

Thus, in the present case, the right of the parents to recover from the doctor was in no way affected by their settlement with the hospital, and the parents are entitled to keep the advantage of their bargaining. The parents' position is that these principles necessarily remove the settlement from operation of the statutory cap. Dr. Ohaebosim's position is that these principles were announced in circumstances that did not include a statutory cap and, hence, are not conclusive in the present case.

In *McCart v. Muir*, 230 Kan. 618, 619-20, 641 P.2d 384 (1982), the court considered "the nature and amount of damages allowable under the provisions of K.S.A. 60-1903." In that case, three sets of parents claimed separate damages for the deaths of their children in an automobile collision. The defendant was the surviving father of the driver who was at fault, and the theory of liability was negligent entrustment. Plaintiffs settled their claims against the estate of Stephen Muir for undisclosed sums. At that time, K.S.A. 60-1903 limited aggregate wrongful death damages to $25,000. No question was raised about whether the settlement with the son's estate ought to be credited against wrongful death damages recovered from the father. The court did consider the question that arose from the interplay between comparative negligence principles and the statutory cap on damages recoverable for wrongful death: "Should the percentage reduction of a claimant's award as required by subsection (*a*) of K.S.A. 60-258a be applied to the statutory limit specified in K.S.A. 60-1903 or should it be applied to the total nonpecuniary damages awarded by the jury?" 230 Kan. at 629. Here is the court's discussion of this issue:

"For instance, suppose 30% fault is attributed to a decedent and in turn imputed to the claimant. Consider in that situation that the jury awards $100,000.00 nonpecuniary damages. How is the actual amount allowable to be determined when you must consider the statutory limitation of $25,000.00? Is the $25,000.00 to be reduced by the 30% fault which is attributed to decedent and in turn imputed to claimant? If so, the tortfeasor's 70% fault will afford a judgment for only $17,500.00. When 30% or $7,500.00 is subtracted from the $25,000.00 limit only $17,500.00 remains. On the other hand, if the actual jury award for nonpecuniary damages of $100,000.00 is to be reduced first by the 30% fault of the decedent and claimant, the result would be $70,000.00. If this procedure is followed, the

$25,000.00 maximum limit becomes the amount for which the others who contributed to cause the death will be liable.

"The Minnesota court arrived at this latter result in *Olson v. Hartwig*, 288 Minn. 375, Syl., 180 N.W.2d 870 (1970), and held:

'In applying our comparative negligence statute, Minn. St. 604.01, in an action for death by wrongful act brought under Minn. St. 573.02, the percentage of plaintiff's decedent's negligence is to be deducted from the damages awarded by the court or jury rather than from the maximum permissible recovery permitted under § 573.02.'

"The federal district court for the district of Kansas in *Benton v. Union Pac. R. Co.*, 430 F. Supp. 1380 (D. Kan. 1977), in addressing this question, states:

'Accordingly, when the comparative negligence statute is called into play, we cannot say the wrongful death limitation was intended to be the measure of damages sustained. On the other hand, it clearly is a limitation on the amount of damages recoverable. Under all the circumstances we agree with the view expressed in *Olson*, that it is far more equitable to allow the plaintiff the opportunity to recover the statutory maximum than to further reduce her recovery. The injustice of allowing a plaintiff whose decedent was contributorily negligent to perhaps recover as much as a plaintiff whose decedent was not negligent seems slight, compared with the injustice of further reducing plaintiff's recovery, when her maximum recovery is already far less than her actual damages.' 430 F. Supp. at 1386.

"In *Kleibrink v. Missouri-Kansas-Texas Railroad Co.*, 224 Kan. 437, 445, 581 P.2d 372 (1978), this court in considering the question said:

'We are not faced with the question of how the wrongful death statute's limitation interacts procedurally with the comparative negligence statute in this case. [Citations omitted.] It should be noted [, however,] under our wrongful death statute, the death limitation is *not* a measure of compensation. Instead, it is simply a limitation upon recovery.'

"See also *Mueller v. Silver Fleet Trucking Co.*, 254 Wis. 458, 37 N.W.2d 66 (1949).

"In applying the comparative negligence statute, K.S.A. 60-258a, in an action for death by wrongful act brought under K.S.A. 60-1901 *et seq.*, the percentage of causal fault attributable to decedent's negligence plus the percentage of additional causal fault attributable to any direct negligence of the plaintiff are to be deducted from the amount of damages awarded by the court or jury for nonpecuniary damages, rather than from the maximum permissible recovery for nonpecuniary damages allowable under K.S.A. 60-1903. As to pecuniary damages awarded the usual procedure for arriving at liability based on proportionate fault should be followed." 230 Kan. at 629-31.

Dr. Ohaebosim urges the court to consider this issue as a matter of his receiving credit for the amount the hospital paid to the parents in settlement. He cites *York v. InTrust Bank, N.A.*, 265 Kan.

271, 962 P.2d 405 (1998), a case involving intentional tort liability in which the court considered credit for settlements. On appeal, this court prefaced its discussion of the trial court's crediting the bank for the settlement amounts paid by other defendants by emphasizing that

"this is *not* a case involving the comparative negligence (fault) provision of K.S.A. 60-258a. . . . As such, we do not attempt to apply any of our rules relating to K. S. A. 60-258a. . . . K. S. A. 60-258a did not change the common-law rule of joint and several liability for defendants in intentional tort actions. *Sieben v. Sieben*, 231 Kan. 372, 378, 646 P.2d 1036 (1982)." 265 Kan. at 310-11.

The joint and several liability principles on which the court based its discussion and decision in *York* have no application in the present case.

K. S. A. 60-1902 establishes who may maintain a wrongful death action. K. S. A. 60-1903(a) and (b) limit the amount of damages:

"(a) In any wrongful death action, the court or jury may award such damages as are found to be fair and just under all the facts and circumstances, but the damages, other than pecuniary loss sustained by an heir at law, cannot exceed in the aggregate the sum of $100,000 and costs.

"(b) If a wrongful death action is to a jury, the court shall not instruct the jury on the monetary limitation imposed by subsection (a) upon recovery of damages for nonpecuniary loss. If the jury verdict results in an award of damages for nonpecuniary loss which, after deduction of any amounts pursuant to K.S.A. 60-258a and amendments thereto, exceeds the limitation of subsection (a), the court shall enter judgment for damages of $100,000 for nonpecuniary loss."

K. S. A. 60-1904 specifies the elements of damage. K. S. A. 60-1905 provides for apportionment of the recovery among the heirs according to the loss sustained.

Subsection (a) of 60-1903 authorizes a court or jury to award fair and just damages but prohibits nonpecuniary damages from exceeding in the aggregate the sum of $100,000. The legislature used the terms "award" and "damages," words associated with trials and verdicts. It did not use the terms "proceeds" or "settlement." The legislature expressly limited damages "in the aggregate," which clearly shows the legislature's intent to aggregate the damage awards attributable to co-tortfeasors, but the statute is silent as to settlement proceeds. Subsection (b) of 60-1903, too, is in trial

terms. Subsection (b) comes into play if the jury verdict results in an award of damages for nonpecuniary loss which, after deduction of any amounts pursuant to K.S.A. 60-258a and amendments thereto, exceeds the limitation of subsection (a). In that event, the court is required to enter judgment for nonpecuniary loss in the amount of the limit.

K. S. A. 60-258a provides in part:

"(a) The contributory negligence of any party in a civil action shall not bar such party or such party's legal representative from recovering damages for negligence resulting in death, personal injury, property damage or economic loss, if such party's negligence was less than the causal negligence of the party or parties against whom claim for recovery is made, but the award of damages to any party in such action shall be diminished in proportion to the amount of negligence attributed to such party. *If any such party is claiming damages for a decedent's wrongful death, the negligence of the decedent, if any, shall be imputed to such party.*

"(b) Where the comparative negligence of the parties in any such action is an issue, the jury shall return special verdicts, or in the absence of a jury, the court shall make special findings, determining the percentage of negligence attributable to each of the parties, and determining the total amount of damages sustained by each of the claimants, and the entry of judgment shall be made by the court. No general verdict shall be returned by the jury.

. . . .

"(d) Where the comparative negligence of the parties in any action is an issue and recovery is allowed against more than one party, each such party shall be liable for that portion of the total dollar amount awarded as damages to any claimant in the proportion that the amount of such party's causal negligence bears to the amount of the causal negligence attributed to all parties against whom such recovery is allowed." (Emphasis added.)

The comparative negligence statute requires that the percentage of fault attributable to each party be determined and limits each party's liability to its percentage of the total damage award. Thus, it appears that the phrase, "after deduction of any amounts pursuant to K. S. A. 60-258a," in subsection (b) of K.S.A. 60-1903 refers to any percentage of the total damage award for which claimant is responsible due to imputation of the percentage of fault determined to be attributable to the decedent. It further appears that what remains after deduction of any percentage of the damage award imputed to claimant is the "aggregate sum" to which the statutory cap is applied.

Neither K.S.A. 60-1903 nor K.S.A. 60-258a expressly takes the apportionment principles or procedures beyond trial proceedings. This court has held that the comparative negligence statute will not permit a jury verdict to be reduced by any amount plaintiff may have received in settlement from other defendants. See *Glenn v. Fleming*, 240 Kan. 724, 732 P.2d 750 (1987). Neither K.S.A. 60-1903 nor K.S.A. 60-258a expressly takes into account a settlement agreement between a decedent's heirs and a tortfeasor. Moreover, the interpretation given to the statutes by the trial court does not seem to be implied in the statutory language.

The cap specified in K.S.A. 60-1903 is not a measure of damages, but rather limits the recovery of the damages awarded by a judge or jury. The percentage of fault is applied to the jury's nonpecuniary damages award to determine the amount of damages attributable to a defendant. Where the damages attributable to the defendant are in excess of the cap, the recovery is limited to the amount of the cap.

In the present case, the Adams' settlement with the hospital has no effect on their right of recovery from Dr. Ohaebosim. The Adamses are entitled to keep the benefit of their bargain with the hospital. The jury verdict included an award of $1,800,000 to the parents for the nonpecuniary loss of their daughter. With no fault being attributed to decedent, there was no percentage imputed to the parents to be deducted from the award. Applying the jury's apportionment of 90% fault to the doctor to the $1,800,000 produces the figure of $1,620,000. The statutory cap applies to the award of $1,620,000, thus reducing the award to $100,000. The Adamses are entitled to a judgment of $100,000 against Dr. Ohaebosim. Thus, the trial court erred in not granting the Adamses a judgment of $100,000 for their wrongful death claim.

In the trial court and in this court, appellants contend that the statutory cap on wrongful death damage awards is unconstitutional in that it impairs the right to trial by jury, violates due process, and violates equal protection. The trial court declined to declare K. S. A. 60-1903 unconstitutional. In *Leiker v. Gafford*, 245 Kan. 325, 359-65, 778 P.2d 823 (1989), *overruled in part on other grounds Martindale v. Tenny*, 250 Kan. 621, 629, 829 P.2d 561 (1992), this

court upheld the constitutionality of K. S. A. 60-1903 on all grounds raised by appellants in the present case. Appellants ask the court to overrule that holding of *Leiker*. We decline to do so.

In his cross-appeal, Dr. Ohaebosim first argues that he had no duty of care to Nichelle Adams. The doctor raised the issue in the trial court by motion for judgment as a matter of law and to reconsider the judgment. The trial court overruled the doctor's post-trial motions to reconsider the judgment, for remittitur, and for new trial.

Whether a duty exists is a question of law. *Nero v. Kansas State University*, 253 Kan. 567, Syl. ¶ 1, 861 P.2d 768 (1993). This court's review of a question of law is unlimited.

Dr. Ohaebosim contends that there was no physician-patient relationship between him and Nichelle Adams on July 22, 1992, and that in the absence of a physician-patient relationship, no duty arose. He relies on Michigan, South Carolina, Georgia, and Oregon cases for the proposition that the existence of a physician-patient relationship is a necessary prerequisite for medical malpractice liability. He cites one federal case in which Kansas law was applied and a number of cases from other states' courts but none from the courts of this state on the question of whether he had a physician-patient relationship with Nichelle Adams. None of the cases he cites involves circumstances like those in the present case.

From the cases cited by the doctor and from other cases located in our research, certain general principles may be drawn that govern situations in which the existence of a physician-patient relationship is in question. Those cases not cited elsewhere in this discussion are: *Doran v. Priddy*, 534 F. Supp. 30 (D. Kan. 1981) (obstetrician declined request of hospital nurse to intervene in patient's care in absence of patient's treating physician); *Clanton v. Von Haam*, 177 Ga. App. 694, 340 S.E.2d 627 (1986) (doctor declined to give late night medical advice over telephone); *Weaver v. U of M Bd. of Regents*, 201 Mich. App. 239, 506 N.W.2d 264 (Mich. App. 1993) (telephone call to schedule an appointment; no medical advice sought); *Cintron by Bultron v. New York Med. College*, 597 N.Y.S.2d 705, 193 A.D.2d 551 (1993) ("on call" doctor, who was telephoned by attending doctor and concurred in attend-

ing doctor's opinion of needed treatment, did not impose on "on call" doctor duty to treat the patient); *Gibbons v. Hantman*, 395 N.Y.S.2d 482, 58 A.D.2d 108 (1977), *aff'd* 403 N.Y.S.2d 895, 374 N.E.2d 1246 (1978)(general practitioner instructed patient to return to surgeon who performed surgery for treatment of complication); *Roberts v. Hunter*, 310 S.C. 364, 426 S.E.2d 797 (1993) (patient left emergency room before "on call" neurologist got there); *Lection v. Dyll*, 2000 WL 1612150, (Tex. App. 2000) ("on call" neurologist listened over telephone to emergency room doctor's description of patient's symptoms after patient had left emergency room); *Day v. Harkins & Munoz*, 961 S.W.2d 278 (Tex. App. 1997) (physicians who contracted with arena to provide medical services during a rock concert owed no duty to concertgoer who died from asthma attack after concert ended and doctors had left the premises); *Fought v. Solce*, 821 S.W.2d 218 ( Tex. App. 1991) (telephone conversation between emergency doctor and consulting physician, who declined to see the patient); *Childs v. Weis*, 440 S.W.2d 104 (Tex. Civ. App. 1969) (doctor advised patient to seek treatment from another doctor); *Oja v. Kin*, 229 Mich. App. 184, 581 N.W. 2d 739 (1998) (analysis of duty based on doctor's contractual relationship with the hospital and intention that patient be third-party beneficiary). For example, a doctor's not dealing directly with a patient does not preclude the existence of a physician-patient relationship. See *St. John v. Pope*, 901 S.W.2d 420 (Tex. 1995) ("on call" internist consulted about emergency room patient recommended that patient be referred either to a hospital with a neurosurgeon or to doctor who performed recent surgery). A doctor, who instead of giving medical advice, suggests that a patient contact another doctor or transfer to another facility does not form a physician-patient relationship. 901 S.W. 2d at 424. A physician-patient relationship is consensual. Thus, where there is no ongoing physician-patient relationship, the physician's express or implied consent to advise or treat the patient is required for the relationship to come into being. Stated otherwise, the doctor must take some affirmative action with regard to treatment of a patient in order for the relationship to be established. See *Lopez v. Aziz*, 852 S.W.2d 303, 306-07 (Tex. App. 1993).

In the present case, the jury was instructed in this regard as follows:

"The physician-patient relationship is a consensual one in which the patient knowingly seeks the physician's assistance and the physician knowingly accepts the patient as a patient. The relationship is contractual and wholly voluntary, and is created by agreement expressed or implied.

"A physician-patient relationship may be created in any number of ways, including the act of a physician agreeing to give or giving advice to a patient in person or by telephone."

The factors Dr. Ohaebosim advances in support of his position that no physician-patient relationship existed on July 22, 1992, between him and Nichelle Adams are the following:

(1) A physician-patient relationship did exist on that date between him and Mrs. Adams.

(2) He had not seen, talked to, or treated Nichelle for approximately four years prior to July 22.

(3) He did not speak to Nichelle on July 22.

(4) His only knowledge of Nichelle's obstetric history was the information provided by Mrs. Adams during the telephone conversation.

(5) He no longer provided obstetrical care.

(6) He "took no action other than discussing, in very general terms," Nichelle's condition with Mrs. Adams.

(7) He did not consider Nichelle to be his patient, and Nichelle did not consider him to be her doctor.

Of these factors, the key to resolving this issue is Dr. Ohaebosim's own statement that he discussed Nichelle's condition with Mrs. Adams. In doing so, he consented to give medical advice about Nichelle's condition and he gave it. It is immaterial that he had not seen Nichelle for several years. It is immaterial that he did not speak directly to Nichelle on July 22. It is not significant in the circumstances that he states that he did not consider Nichelle to be his patient and that Nichelle did not consider him to be her doctor. He did consider Mrs. Adams to be his patient. He was a family physician, and in years past he had treated her daughter, Nichelle. When Mrs. Adams spoke to him by telephone on July 22 and told him that Nichelle was 5-8 weeks pregnant and experiencing abdominal pain, Dr. Ohaebosim did not say that he did not consider Nichelle to be his patient. He did not say that he no longer

provided obstetrical care. Rather than suggesting to Mrs. Adams that she contact another doctor at that time, he listened to what Mrs. Adams told him about Nichelle and gave her his medical opinion in response. Dr. Ohaebosim's undertaking to render medical advice as to Nichelle's condition gave rise to a physician-patient relationship. Thus, even if the earlier physician-patient relationship between Dr. Ohaebosim and Nichelle had lapsed or been extinguished, it was renewed.

The essential difference between the facts of this case and those cited by Dr. Ohaebosim is his taking some action to give medical assistance. Typical of the cases he cites is *Ortiz v. Shah*, 905 S.W.2d 609 (Tex. App. 1995). Ortiz was taken to the emergency room with a gunshot wound. The emergency room nurse paged Dr. Shah, who was the "on call" surgeon. Before Dr. Shah reached the hospital, Ortiz had been treated in the emergency room and taken to surgery, where he died. Dr. Shah had no prior relationship with Ortiz. Dr. Shah never saw the patient Ortiz. He never talked to him, and he never gave any advice to anyone about Ortiz's care. He simply told the nurse who contacted him that he was on his way to the hospital. Dr. Shah had taken no action that affected the medical treatment received by Ortiz. Dr. Ohaebosim, in contrast, gave his medical opinion about Nichelle Adams' condition. His opinion was that she was experiencing nothing unusual, which served to reassure Mrs. Adams about her daughter's condition and dissuade her from promptly seeking medical attention for Nichelle.

Dr. Ohaebosim contends that he declined to treat Nichelle. He did not decline to express his medical opinion about her condition. Thus, he cannot be said to have declined to treat her. A physician-patient relationship existed between Dr. Ohaebosim and Nichelle, and a duty of care was owed by Dr. Ohaebosim to Nichelle.

Dr. Ohaebosim also contends that plaintiffs' counsel's remarks in closing argument prejudiced the jury and influenced its verdict.

Near the end of his closing argument, counsel for Mr. and Mrs. Adams suggested to the jurors that they were responsible for setting the standard of care in their community and that their decision would be of consequence for the community. Lifted from context, the remarks complained of are as follows:

"And what you do here today will go out into the community and will reverberate through this community . . . long after you've left.

. . . .

"[I]f you return a verdict in favor of Dr. Ohaebosim, what you are basically telling the world is that everywhere else but in Wichita, Kansas this is the standard of care."

Defendant's counsel objected to both statements with the phrase "sending a message." The trial court overruled the first objection and ignored the second.

On cross-appeal, Dr. Ohaebosim contends that these arguments were improper. He invites the court to compare plaintiffs' counsel's remarks with remarks that the Court of Appeals found to be improper in *Masson v. Kansas City Power & Light Co.*, 7 Kan. App. 2d 344, 642 P.2d 113, *rev. denied* 231 Kan. 801 (1982). He directs the court's attention to Masson's counsel suggesting to the jury that if it reached a verdict in his client's favor, " *'you will have done that one American duty and sent a message to a utility that you are not going to put up with the kind of treatment of your citizens*, you have got a chance to be heard that an individual never has.' Emphasis added." 7 Kan. App. 2d at 348.

Mr. and Mrs. Adams object that the partial transcript of closing argument, which includes none of the closing argument on behalf of Dr. Ohaebosim, is uncertified and, in any event, does not satisfy the requirement that an adequate record on appeal be supplied by the complaining party. We agree that this issue cannot be considered properly on the record before the court. An appellant, in this case the cross-appellant, has the duty to designate a record sufficient to establish the claimed error. Without an adequate record, the claim of alleged error fails. *In re B.M.B.*, 264 Kan. 417, 435, 955 P.2d 1302 (1998).

Judgment on wrongful death damages is reversed, and the matter is remanded to the district court with directions to enter judgment against Dr. Ohaebosim for wrongful death damages in the amount of $100,000.