# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Estate of Kundert v. Illinois Valley Community Hospital*, 2012 IL App (3d) 110007

| | |
|---|---|
| Appellate Court Caption | THE ESTATE OF KAMERYN L. KUNDERT, Deceased, by Dustin Kundert, Special Administrator, and DUSTIN KUNDERT and KRISTA GRADY, Individually, Plaintiffs-Appellants, v. ILLINOIS VALLEY COMMUNITY HOSPITAL, its Agents, Servants and Employees, Defendant-Appellee. |
| District & No. | Third District<br>Docket No. 3-11-0007 |
| Filed | January 12, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly dismissed plaintiffs' medical malpractice action against defendant hospital on behalf of their deceased child, who succumbed to bacterial meningitis after the child was taken to defendant hospital and was told that the hospital did not have the equipment or medical personnel to provide medical services to infants, since no relationship existed between decedent, or his parents, and defendant sufficient to create a legal duty of care. |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 09-L-54; the Hon. James A. Lanuti, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Tracy A. Robb (argued) and Thomas W. Stewart, both of Curcio Law Offices, of Chicago, for appellants.

Douglas A. Gift (argued), of Herbolsheimer, Lannon, Henson, Duncan & Reagan, of La Salle, for appellee.

Panel

PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Lytton and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs, Dustin Kundert and Krista Grady, brought this medical malpractice suit on behalf of their deceased child, Kameryn Kundert, and his estate against defendant, Illinois Valley Community Hospital (Illinois Valley). The circuit court of La Salle County dismissed the action pursuant to section 2-615 of the Illinois Code of Civil Procedure (the Code). 735 ILCS 5/2-615 (West 2008). Plaintiffs appeal, claiming the court erred when holding, as a matter of law, no relationship existed between the decedent, or his parents, and defendant sufficient to create a legal duty of care. We affirm.

¶ 2                                        FACTS

¶ 3    Given the procedural history of this case, the facts we recite are derived from plaintiffs' second amended complaint.

¶ 4    On April 18, 2007, Krista Grady gave birth to Kameryn Kundert. Krista and Dustin Kundert are Kameryn's parents. On April 27, 2007, April 29, 2007, May 11, 2007, and May 22, 2007, Krista presented Kameryn to Illinois Valley for care pursuant to orders from Dr. Kara Fess.

¶ 5    On May 31, 2007, Kameryn exhibited signs and symptoms of a serious illness. Unable to reach Dr. Fess at Hygienic Institute Community Health Center, Krista called Illinois Valley at 7:29 p.m. that night. She informed the operator that she needed to speak to a medical professional for advice about Kameryn's symptoms.

¶ 6    The operator transferred the call to an individual in the emergency room. Krista told this unknown individual that Dr. Fess, the child's primary pediatrician, could not be reached. Krista then described Kameryn as a six-week-old newborn with a high temperature who was very fussy, unable to sleep and refusing to eat. The individual informed Krista that she was overreacting, which was typical for new mothers, to administer Tylenol and give Kameryn tepid baths. The individual was unsure of the proper dosage of Tylenol and, as such,

instructed Krista to contact a pharmacy. The individual noted that the symptoms described did not require immediate medical attention and to follow up with Dr. Fess in the morning. Finally, "the individual on the telephone advised [Krista] that Illinois Valley did not have the equipment or medical personnel to provide medical services to infants." Krista called a pharmacy to determine the proper amount of Tylenol to give Kameryn.

¶ 7 Relying on the information received during the phone call, Krista postponed seeking medical treatment for Kameryn until Dr. Fess's office opened at 8 a.m. on June 1, 2007. Following an examination in Dr. Fess's office, Dr. Fess arranged for Kameryn to be transported via ambulance to Illinois Valley's emergency room. Dr. Fess advised the emergency room personnel that a septic six-week-old would be arriving. Once there, medical personnel performed a lumbar puncture, took a chest X-ray and administered intravenous fluids and oxygen. Within an hour of arriving, Kameryn was transferred to St. Francis Medical Center to receive a "higher level of specialized medical treatment not available at Illinois Valley." At St. Francis, Kameryn was treated for bacterial meningitis. He died on June 15, 2007.

¶ 8 Plaintiffs alleged that based on the medical advice given via telephone from Illinois Valley on May 31, 2007, "approximately 15 hours of valuable time was lost which resulted in a delay of medical treatment necessary to sustain life." Plaintiffs' second amended complaint identifies numerous allegedly negligent acts committed by Illinois Valley, including failing to recognize the signs and symptoms of meningitis, improperly diagnosing Kameryn and improperly refusing to instruct Krista. While the second amended complaint contains references to the Rights of Married Persons Act (750 ILCS 65/15 (West 2008)) and agency principles, all theories of recovery are based on the tort of negligence. Illinois Valley filed a section 2-615 (735 ILCS 5/2-615 (West 2008)) motion to dismiss this complaint, arguing, *inter alia*, that, as a matter of law, no relationship existed between decedent and defendant. Defendant asserted that without such a legal relationship, it owed decedent no duty. Therefore, defendant contended, it could not be negligent toward decedent. The trial court agreed and granted defendant's motion to dismiss. The order granted plaintiffs leave to file a third amended complaint containing allegations "as to events occurring after the child was brought to the defendant emergency department on June 1, 2007." Plaintiffs filed a motion to reconsider, which the trial court denied. In denying plaintiffs' motion to reconsider, the trial court noted, "Plaintiff has chosen to stand on his second amended complaint. This order is final, and cause is dismissed with prejudice." This appeal followed.

¶ 9                                                    ANALYSIS

¶ 10 A motion brought pursuant to section 2-615 of the Code challenges the legal sufficiency of a complaint. 735 ILCS 5/2-615 (West 2008); *Marshall v. Burger King Corp.*, 222 Ill. 2d 422 (2006). As such, we review *de novo* an order granting a section 2-615 motion to dismiss, accepting all well-pleaded facts and reasonable inferences drawn therefrom as true. *Tedrick v. Community Resource Center, Inc.*, 235 Ill. 2d 155 (2009). We must also construe the allegations contained within the complaint in the light most favorable to the plaintiff. *Id.*

¶ 11 To be legally sufficient, a complaint for negligence must set out facts that establish the

-3-

existence of a duty owed by the defendant to the plaintiff, a breach of that duty and an injury proximately caused by that breach. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987); *Teter v. Clemens*, 112 Ill. 2d 252, 256 (1986). Plaintiffs acknowledge that, generally, the "determination of whether a duty exists–whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff–is an issue of law to be determined by the court." *Kirk*, 117 Ill. 2d at 525. Factors used to determine whether a duty exists include the reasonable foreseeability of injury, likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant. *Id.* at 526. In the medical malpractice arena, a "physician's duty arises only when a clear and direct physician-patient relationship has been established." *Siwa v. Koch*, 388 Ill. App. 3d 444, 447 (2009), *appeal denied*, 232 Ill. 2d 597 (2009); see also *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80 (1996).

¶ 12      Our supreme court discussed the physician-patient relationship in *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507 (1987). In *Kirk*, a plaintiff injured in an automobile accident brought suit against drug manufacturers, physicians and a hospital, alleging negligence and asserting strict product liability claims. *Id.* at 514. Plaintiff was injured while a passenger in a car driven by Daniel McCarthy when the car struck a tree. *Id.* McCarthy had been a psychiatric patient at the defendant hospital where he was treated by the defendant physicians. *Id.* Plaintiff alleged that defendants failed to adequately warn McCarthy that drugs prescribed would diminish his physical and mental abilities. *Id.* at 515. Plaintiff also sought relief based upon strict product liability theories against the drug manufacturers and hospital. *Id.* The *Kirk* court held that the "negligence count against the hospital failed to state a cause of action because it lacks the first essential element in a negligence claim: a recognized duty of care owed by the defendant to the particular plaintiff. The trial court properly dismissed this count." *Id.* at 528. Similarly, the court found there "is no patient-doctor relationship here between the two defendant doctors and [the injured party]." *Id.* at 530.

¶ 13      Basing its opinion mainly on language derived from *Kirk*, the *Reynolds v. Decatur Memorial Hospital*, 277 Ill. App. 3d 80 (1996), court examined a case in which a minor patient presented at the emergency room with injuries sustained in a fall from jumping on a couch. *Id.* at 81. Dr. Balagna examined the minor, admitted him to the hospital then called Dr. Bonds, a pediatrician, requesting that Bonds examine the minor. *Id.* at 82. After examining the minor, Dr. Bonds noted that a "history of a two-foot fall with a normal 2½-year-old child did not indicate to her the existence of a cervical cord injury from trauma." *Id.*

¶ 14      Dr. Bonds then phoned Dr. Fulbright and advised Dr. Fulbright, a neurosurgeon, of the facts of the case. *Id.* Fulbright suggested a course of action for the minor, including performing a spinal tap to rule out meningitis. *Id.* Dr. Bonds performed the spinal tap and made an entry in the minor's chart "to consult with Fulbright to see in early a.m." (Internal quotation marks omitted.) *Id.* at 83. Fulbright never examined the minor, who ultimately was diagnosed with Guillain-Barre syndrome resulting in quadriplegia. *Id.* The minor, by his mother and next friend, sued Fulbright and others for medical malpractice. The allegations

-4-

against Fulbright centered on the failure to examine the minor and his medical records before making a recommendation and failing to follow through after being consulted. *Id.* at 84. The trial court found Fulbright owed no duty to the minor and, therefore, granted Fulbright's motion for summary judgment. *Id.* The *Reynolds* court affirmed, stating:

> "The determination of whether the parties stood in such a relationship to one another that the law would impose on defendant a duty of reasonable conduct for the benefit of the plaintiff is a question of law. That policy determination is based on consideration of the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant. [Citation.] A physician's duty is limited to those situations in which a direct physician-patient relationship exists or there is a special relationship such as when an infant sues for prenatal injuries foreseeably caused by the physician's negligent care of the mother prior to conception. [Citations.] In this case, there was no special relationship *** and there was no direct physician-patient relationship, and hence no duty owed to plaintiffs by Fulbright. This determination was properly made as a matter of law.
>
> The relationship of physician and patient is one of trust and confidence. It is a consensual relationship in which the patient knowingly seeks the physician's assistance and the physician knowingly accepts the person as a patient." *Id.* at 85.

¶ 15    While acknowledging that a relationship can exist "where other persons contact a physician on behalf of the patient," the *Reynolds* court noted that Fulbright was not asked to provide a service for the child, conduct laboratory tests or view test results. *Id.* Further noting Fulbright was only contacted once and charged no fee, the *Reynolds* court held, "A doctor who gives an informal opinion at the request of a treating physician does not owe a duty of care to the patient whose case was discussed." *Id.*

¶ 16    The court in *Gathings v. Muscadin*, 318 Ill. App. 3d 1091 (2001), reviewed a situation in which a 20-month-old infant was admitted to the hospital for fever, overall weakness and repeated vomiting. The treating physician attempted to obtain a consultation with defendant pediatrician, Dr. Jean-Wilson Muscadin. *Id.* at 1092. A nurse paged defendant, who eventually told the nurse he was out of town at a charity event, not "on call" and unavailable to accept the consultation. *Id.* at 1093. The following morning, the 20-month-old died. *Id.* Plaintiffs' theory of negligence against Dr. Jean-Wilson Muscadin centered on his "failure to come to the hospital in response" to the treating physician's request for consultation. *Id.* Following the close of evidence, the trial court directed a verdict for defendant and the appellate court affirmed. *Id.*

¶ 17    The *Gathings* court found it "undisputed" that defendant "declined the consultation" and, as such, the circuit court properly found no physician-patient relationship existed. *Id.* The court further noted defendant provided no service to decedent, conducted no laboratory tests and reviewed no test results. *Id.* at 1094. Noting the *Bovara* court found it was for the trier of fact to decide "whether a physician-patient relationship was formed between defendants and the decedent," the *Gathings* court concluded that no similar question of fact existed since defendant "was not in any way involved with the medical decisions made" for decedent. *Id.* at 1095.

¶ 18	The circuit court in *Gillespie v. University of Chicago Hospitals*, 387 Ill. App. 3d 540 (2008), granted defendant doctor's motion for a directed verdict following the close of plaintiffs' case. *Gillespie* involves a 19-year-old patient who went to the emergency room complaining of shortness of breath and chest pain. *Id.* at 542. The emergency room physicians diagnosed the patient with musculoskeletal chest pain, instructed her to follow up with her treating physician or Dr. Vashi, the internist on call at the hospital, and discharged her the following day. *Id.* The hospital's policy was to list the internist on call as the attending/admitting physician if a patient presents to the emergency room whose primary care physician is not on staff at the hospital. *Id.* As the patient's primary care physician was not on staff at the hospital, Dr. Vashi was listed as the attending physician. *Id.* After the patient's discharge, the results from her EKG, lung scan and laboratory tests were placed in Dr. Vashi's "doctor's box." *Id.* He interpreted the EKG, authored a written report regarding the results and billed the patient's insurer $69 for his services. *Id.*

¶ 19	Approximately six weeks later, the patient returned to the emergency room. *Id.* at 543. Eventually, she was transferred to the University of Chicago Hospitals in hope of receiving a heart transplant but died from cardiac failure before one could be performed. *Id.* It was ultimately determined that the patient suffered from a condition known as postpartum cardiomyopathy. *Id.* Reciting language from *Reynolds* and *Kirk*, the *Gillespie* court held no physician-patient relationship existed. *Id.* at 546. The court found it "significant that Dr. Vashi's actions occurred after [the patient's] discharge and in no way played a role in [the patient's] treatment or care." *Id.* The court noted that the "relationship of physician and patient is a consensual relationship in which the patient knowingly seeks the physician's assistance and the physician knowingly accepts the person as a patient." *Id.* at 544 (citing *Reynolds*, 277 Ill. App. 3d at 85).

¶ 20	The most recent Illinois case addressing the subject we have reviewed is *Siwa v. Koch*, 388 Ill. App. 3d 444 (2009). Relying on language from *Reynolds*, the *Siwa* court similarly found no physician-patient relationship existed. *Id.* at 448. The *Siwa* plaintiff worked at a medical center that also employed defendant, Dr. Koch, a radiologist. *Id.* at 445-46. The medical center installed new software on a CT scanner it owned. *Id.* at 446. Plaintiff volunteered to undergo a scan as part of a testing and training program at the medical center. *Id.* Plaintiff's scan, which Dr. Koch reviewed, revealed an abnormally high coronary artery calcification score, but Dr. Koch never completed a written report of the scan's results. *Id.* Nevertheless, Dr. Koch spoke to the plaintiff twice about the findings and urged him to see a cardiologist. *Id.* Before seeing a cardiologist, the plaintiff suffered a fatal heart attack while playing basketball. *Id.* at 446-47. His estate sued Dr. Koch for medical malpractice. *Id.*

¶ 21	Again, relying on the aforementioned passages from *Reynolds*, the *Siwa* court found that "as a matter of law," Dr. Koch "owed no duty of care to [the plaintiff]." *Id.* at 448. This was so even though Dr. Koch and the plaintiff twice discussed plaintiff's condition and he advised the plaintiff to seek the advice of a specialist. *Id.* The *Siwa* court noted that, "A physician's duty arises only when a clear and direct physician-patient relationship has been established." *Id.* at 447. Citing to *Reynolds*, the court noted that to such a "relationship cannot be established where a patient does not seek that physician's medical advice and the physician does not knowingly accept that person as a patient." *Id.* at 447. The *Siwa* court

stressed that Dr. Koch "did not even know that [the plaintiff] was one of the volunteers who would participate in the test." *Id.* While the court acknowledged that Dr. Koch gave the plaintiff advice, "twice urging him to see a cardiologist," it held that no duty arose "from the giving of the advice." *Id.* Although he interpreted the plaintiff's tests and dispensed medical advice, the *Siwa* court held Dr. Koch never accepted the plaintiff as a patient. *Id.* at 447-48.

¶ 22        Returning to this case, we find the plaintiffs' second amended complaint fails, as a matter of law, to state a cause of action.

¶ 23        To be clear, plaintiffs have not alleged, and make no argument to this court, that Kameryn's previous trips to Illinois Valley created an on-going physician-patient relationship or any special relationship upon which a duty of care can be based. Plaintiffs' reply brief makes clear that allegations regarding "earlier discharges *** serve only to illustrate the fact that plaintiffs, in addition to being members of the community served by the defendant hospital, had previous contact with the defendant hospital and that plaintiffs had developed a trust and confidence in the medical care and treatment rendered by the defendant hospital and its agents. Thus it was reasonable and likely that plaintiffs would turn to defendant hospital to service future medical needs, including the instance cited in the second amended complaint." This all relates to issues not before us.

¶ 24        Plaintiffs argue that their complaint unequivocally establishes: (1) "a direct connection" between Krista and defendant; (2) the fact that Krista knowingly sought medical advice from defendant; (3) that defendant's agent "consented to render medical advice," which equated to "accept[ing] Kameryn as a patient"; and (4) Krista "relied on that advice." We disagree with plaintiffs' conclusion that the allegations in their complaint sufficiently show that defendant knowingly accepted Kameryn as a patient. Language used by the *Siwa* and *Gillespie* courts guides our finding.

¶ 25        Again, the *Gillespie* court stated that the "relationship of physician and patient is a consensual relationship in which the patient knowingly seeks the physician's assistance and the physician knowingly accepts the person as a patient." *Gillespie*, 387 Ill. App. 3d at 544 (citing *Reynolds*, 277 Ill. App. 3d at 85). The *Siwa* court explained this concept by noting, "A physician's duty arises only when a clear and direct physician-patient relationship has been established." *Siwa*, 388 Ill. App. 3d at 447.

¶ 26        Plaintiffs' second amended complaint specifically states that "the individual on the telephone advised [Krista] that Illinois Valley did not have the equipment or medical personnel to provide medical services to infants." We fail to see how the actions of the person on phone, even while viewing all the allegations of the complaint in the light most favorable to the plaintiffs, evince a "knowing acceptance" of Kameryn as a patient. Plaintiffs acknowledge that the person who took the phone call informed Krista that Illinois Valley did not have the equipment or personnel to treat Kameryn that evening.

¶ 27        Plaintiff argues that the act of recommending Tylenol and tepid baths is constructive acceptance of the patient. We note, however, in *Reynolds* that Dr. Fulbright recommended a much more involved course of action, including performing a spinal tap, yet the *Reynolds* court found he did not knowingly accept the patient. *Reynolds*, 277 Ill. App. 3d at 85. The *Reynolds* court noted that Fulbright was never "asked to provide a service for [the patient],

conduct laboratory tests, or review test results. Fulbright did nothing more than answer an inquiry from a colleague" and render "an informal opinion." *Id.* at 85.

¶ 28    Plaintiffs would have us hold that a physician-patient relationship is created anytime a physician dispenses advice. That is, the singular act of dispensing any quantum of advice equates to knowing or at least constructive acceptance of a patient. Case law does not support such a holding.

¶ 29    Again, Dr. Fulbright dispensed advice in *Reynolds*, which impacted that patient's treatment, yet the court found no physician-patient relationship was created. *Reynolds*, 277 Ill. App. 3d at 83. Dr. Vashi commented on the patient's condition when he interpreted test results and authored written reports regarding the test results in *Gillespie*. *Gillespie*, 387 Ill. App. 3d at 542. Nevertheless, no physician-patient relationship was created. *Id.* at 546. Dr. Koch in *Siwa* (*Siwa*, 388 Ill. App. 3d at 446) twice dispensed medical advice directly to the patient. That act, however, was insufficient to create a physician-patient relationship. *Id.*

¶ 30    The unidentified person with whom Krista spoke was not asked to perform any tests, interpret any results or examine Kameryn. The circumstances surrounding the inquiry and response indicate that the person merely gave an informal opinion based upon rather common symptoms: those being a temperature, fussiness and refusal to eat or sleep.

¶ 31    The *Reynolds* court found an inquiry coupled with the informal opinion was insufficient to establish "a consensual relationship in which the patient knowingly seeks the physician's assistance and the physician knowingly accepts the person as a patient." *Reynolds*, 277 Ill. App. 3d at 85. The court noted the "consequence" of finding that such an inquiry and informal opinion sufficiently creates such a relationship "would have a chilling effect upon the practice of medicine. It would stifle communication, education and professional association, all to the detriment of the patient." *Id.* at 86. We envision a similar adverse effect on the practice of medicine were we to find the inquiry and informal advice rendered in this matter created a relationship between patient and medical provider. It is, we think, not unreasonable to expect medical providers would attempt to limit their tort exposure. We would expect that the result of finding that this phone call created a physician-patient relationship would be that anytime a parent called and reported a child with a fever, the response would be the same: "Hang up and call 911 or drive your child to an emergency room." We believe that this would benefit neither the providers nor consumers of medical care. We find public policy supports the trial court's decision.

¶ 32    When describing the actions of the physician in *Gathings*, the court used the phrase, and noted he, "declined the consultation." *Gathings*, 318 Ill. App. 3d at 1094. We can think of no other way to categorize the statement made to Krista that Illinois Valley "did not have the equipment or medical personnel to provide medical services to infants" than a refusal to provide services similar to the *Gathings'* defendant's declination of consultation. At a minimum, that allegation made by plaintiffs defeats any notion that Illinois Valley "knowingly accepted" Kameryn as a patient on the night in question. As such, we hold plaintiffs' second amended complaint fails to properly allege the existence of a hospital-patient relationship and as such no duty existed as a matter of law. Therefore, the trial court did not err in granting defendant's motion to dismiss.

¶ 33    Finally, citing to *Kirk*, *Reynolds* and *Adams v. Via Christi Regional Medical Center*, 19 P.3d 132 (Kan. 2001), plaintiffs assert that the "common thread amongst cases imposing a duty of care is whether the patient sought and received medical advice during the telephone call." We disagree. The common thread running through these cases is whether a patient knowingly sought a physician's service and the physician knowingly accepted the patient. As detailed above, language from *Kirk*, *Reynolds* and *Gillespie* makes clear that the singular act of dispensing advice does not equate to knowing acceptance of a patient. A review and analysis of *Adams* does not change our opinion that no hospital-patient relationship was created in this case.

¶ 34    In *Adams*, the 22-year-old patient, Nichelle, lived at home with her parents. *Id.* at 134. One night after hearing her daughter complain of stomach pains, the 22-year-old's mother called the family's treating physician, who had not examined the daughter for over four years. *Id.* The mother informed the doctor, Dr. Ohaebosim, that the daughter was five to eight weeks pregnant and experiencing abdominal pain. *Id.* Conflicting testimony existed as to what the doctor told the mother.

¶ 35    The doctor testified he told the mother that abdominal pain is not abnormal during pregnancy, but to take the daughter to the emergency room if it got any worse. *Id.* He further claimed to have told the mother to have the daughter see a doctor the next day. *Id.* The doctor stated that the mother did not express urgency or serious concern for the situation. *Id.*

¶ 36    The mother testified that the doctor never told her to take the daughter to the emergency room but, instead, told her to bring the daughter in to see him the next morning. *Id.* Both the doctor and mother admitted that the doctor did not ask any questions about the daughter's condition during the phone call which took place at 9 p.m. *Id.*

¶ 37    At midnight that same night, the mother drove the daughter to the hospital. *Id.* While there, the daughter went into cardiac arrest and was taken to surgery. *Id.* at 135. The daughter died the next day and her parents, individually and as executors of her estate, sued the doctor, claiming she would have lived had she received medical attention at 9 p.m. instead of midnight. *Id.* The case proceeded to trial in which the jury returned a verdict in favor of the plaintiffs for $2 million.

¶ 38    The doctor appealed the verdict, claiming no physician-patient relationship existed and, therefore, as a matter of law, he owed no duty to the plaintiffs. *Id.* at 139. The *Adams* court noted, "A physician-patient relationship is consensual. Thus, where there is no ongoing physician-patient relationship, the physician's express or implied consent to advise or treat the patient is required for the relationship to come into being. Stated otherwise, the doctor must take some affirmative action with regard to treatment of a patient in order for the relationship to be established." *Id.* at 140.

¶ 39    While noting the question of whether a duty exists is a question of law, the *Adams* court found it proper to submit a question to the jury for it to determine whether the phone call from the mother to the doctor created a physician-patient relationship. *Id.* The jury found it did. The *Adams* court found that the doctor "did not decline to express his medical opinion about her condition. Thus, he cannot be said to have declined to treat her." *Id.* at 141. As such, the *Adams* court found a physician-patient relationship existed sufficient to create a

duty of care. *Id.*

¶ 40 The *Adams* court specifically noted that Dr. Ohaebosim "cannot be said to have declined to treat [the patient]." *Adams*, 19 P.3d at 141. Even if we were bound by *Adams*, we see two major distinctions. First, as this matter comes to us following the granting of a motion to dismiss, there can be no question of fact; we must consider all well-pled facts as true. *Tedrick v. Community Resource Center, Inc.*, 235 Ill. 2d 155 (2009). Secondly, and maybe most importantly for our analysis, that forces us to accept as true plaintiffs' contention that the person at the hospital "advised [Krista] that Illinois Valley did not have the equipment or medical personnel to provide medical services to infants." We see no way to interpret this language other than as declining to treat Kameryn.

¶ 41 Plaintiffs suggest a relationship is created any time an inquiry is made to a physician and advice is dispensed. An analysis of applicable case law does not support that contention. *Kirk*, *Reynolds* and their progeny make clear that the relevant inquiry is whether a patient knowingly seeks a physician's services and the physician knowingly accepts the patient.

¶ 42                                                   CONCLUSION

¶ 43 For the foregoing reasons, the judgment of the circuit court of La Salle County is affirmed.

¶ 44 Affirmed.