802 A.2d 440

**Edwin STERLING, Personal Representative
of the Estate of Laverne Sterling et al.,**

v.

**JOHNS HOPKINS HOSPITAL.**

**No. 398, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

July 1, 2002.

Jonathan Schochor (Kerry D. Staton, Schochor, Federico and Staton, P.A., Zev T. Gershon and Janet, Willoughby & Gershon, on the brief) Baltimore, for appellants.

Mairi Pat Maguire (Donald L. DeVries and Goodell, DeVries, Leech & Dann, LLP, on the brief) Baltimore, for appellee.

Argued before DAVIS, ADKINS, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

RAYMOND G. THIEME, Jr., Judge, Retired, Specially Assigned.

Appellants were plaintiffs in two medical malpractice actions that were filed against defendants in the Circuit Courts for Baltimore City and Wicomico County. The complaints alleged negligence against Peninsula Regional Medical Center (PRMC), Floyd Gray, M.D., a doctor with PRMC, and the Johns Hopkins Medical Center for malpractice in the diagnosis and treatment of complications surrounding the late Laverne Sterling's pregnancy.[1] The complaints alleged that the

---

1. On January 5, 1996, Appellant Sarah R. Sterling, the minor child of decedent, filed a wrongful death complaint in the Circuit Court for Baltimore City. On February 5, 1996, Edwin Sterling, the decedent's husband, filed a separate malpractice action with the Circuit Court for Wicomico County. The former lawsuit was transferred to Wicomico County and the cases were consolidated for trial. In each case the appellants elected to waive arbitration under the Health Care Malpractice Claims Act (the "Act"), Maryland Code (1974, 1995 Repl.Vol.), §§ 3–2A–01 through 3–2A–09 of the Courts and Judicial Proceedings

Johns Hopkins Medical Center was negligent in transferring Ms. Sterling from PRMC to Johns Hopkins Hospital in her unstable condition and that this negligent act contributed to her death.

The actions against Dr. Gray and PRMC were settled, after summary judgment motions filed by those parties were denied, leaving Johns Hopkins as the sole remaining defendant. On July 22, 1999, Hopkins had filed a Motion for Summary Judgment, asserting as its principal ground for relief the absence of a physician-patient relationship between its physician and Ms. Sterling. A hearing on the motion was convened, and after argument and consideration of the pleadings, the circuit court entered summary judgment in favor of Hopkins, denied appellants' Motions for Reconsideration on March 27, 2000, and appellants noted this appeal on April 20, 2001. We have jurisdiction pursuant to Md.Code (1974 and 1998 Repl.Vol.) §§ 12–301, 12–308 of the Courts and Judicial Proceedings Article.

### Issue on Appeal

On appeal, appellants ask us to determine whether the circuit court erred in granting summary judgment in favor of the appellee, Johns Hopkins Hospital. We affirm the circuit court and explain.

### Facts

On August 2, 1993, Laverne Sterling was admitted to the PRMC. At the time she was 32.6 weeks pregnant and her personal physician recommended admission to the hospital due to borderline blood pressure and the presence of protein in her urine (proteinuria). Ms. Sterling also presented with edema (swelling due to fluid retention), hypertension, abdominal pain, nausea, and vomiting.

---

Article. Arbitration of a claim may be waived by either party after filing the "certificate of qualified expert." Maryland Code (1974, 1995 Repl.Vol.), § 3–2A–06B of the Courts and Judicial Proceedings Article.

On August 3rd, Ms. Sterling came under the care and treatment of Dr. Floyd E. Gray. By this time, her condition had deteriorated and she had developed hematuria (blood in the urine) and bleeding in her mouth. Dr. Gray ordered labwork and a CT scan of the abdomen. Dr. Gray rendered a presumptive diagnosis of severe pre-eclampsia and a potential HELLP syndrome.[2] As a result of the initial diagnosis, Dr. Gray ordered a magnesium-sulfate intravenous infusion for Ms. Sterling. The diagnoses of severe pre-eclampsia and HELLP syndrome were later confirmed around 12:30 p.m.

Due to this confirmation, Dr. Gray contacted the Emergency Medical Resource Center (EMRC) to arrange for the transfer of Ms. Sterling to another hospital.[3] The transfer was deemed necessary because PRMC did not have a neonatal intensive care unit at this time and there was concern that Ms. Sterling's condition might require a premature delivery of the child. EMRC informed Dr. Gray that Hopkins was the perinatal referral center that he should contact.[4]

---

**2.** Pre-eclampsia is "[t]he development of hypertension with proteinuria or edema, or both, due to pregnancy." STEADMAN'S MEDICAL DICTIONARY at 1419 (26th ed.1995). It is a serious complication of pregnancy. James J. Walker, *Pre-eclampsia*, THE LANCET, Oct. 7, 2000 at 1260. *See Gabaldoni v. Board of Physician Quality Assurance*, 141 Md.App. 259, 264 n. 2, 785 A.2d 771, 774 n. 2 (2001). HELLP is a syndrome characterized by hemolysis, elevated liver enzyme levels, and low platelet count. *See* Maureen O'Hara Padden, *HELLP Syndrome*, AMERICAN FAMILY PHYSICIAN, Sept. 1, 1999 at 829.

**3.** EMRC is a referral service established in 1978 by the Maryland Institute for Emergency Medical Services Systems (MIEMSS) through the Departments of Obstetrics and Gynecology at the Johns Hopkins Hospital and University of Maryland Hospital. The service was created to provide a coordinated maternal transport system to reduce morbidity and mortality. At the time of the events which gave rise to this litigation, the MIEMSS was a component of the University of Maryland. *See* Maryland Code (1978 and 1992 Repl.Vol.) § 13–103 of the Education Article. The MIEMSS is now an independent agency of the State of Maryland, which coordinates communication regarding and transport of emergency patients throughout Maryland. *See Davis v. Johns Hopkins Hospital*, 330 Md. 53, 59, 622 A.2d 128, 131 (1993).

**4.** The Departments of Obstetrics and Gynecology at Johns Hopkins and the University of Maryland Hospitals established in 1978 a High Risk

Upon being connected with Hopkins Hospital, Dr. Gray spoke with Dr. Erica Leventhal, a Hopkins resident. Dr. Gray informed Dr. Leventhal of Sterling's symptoms (hypertension, hematuria, proteinuria, elevated liver enzymes, severe abdominal pain, nausea and vomiting) and informed Dr. Leventhal that he had placed Sterling on a magnesium sulfate drip.

Dr. Leventhal conveyed this information to the attending physician, Dr. Adib Khouzami. Dr. Khouzami, in turn, telephoned Dr. Gray at approximately 1:10 p.m. During the conversation, it was decided that Sterling would be transferred to Hopkins through the Maryland Institute for Emergency Medical Services System (MIEMSS) perinatal referral program. According to MIEMSS protocol, Dr. Gray informed Dr. Khouzami that Sterling was diagnosed as having severe pre-eclampsia, was receiving magnesium sulfate, and was also diagnosed as having HELLP syndrome due to her hematuria and bleeding. Dr. Gray also conveyed Sterling's laboratory test results. Dr. Khouzami recorded this information on the Hopkins Maternal Transport Log. Having determined that Hopkins had the resources available to care for Sterling, it was agreed that she be transferred to the hospital by ambulance, in compliance with MIEMSS procedure.[5]

Dr. Gray thereafter arranged for the transportation of Sterling to Hopkins through a local ambulance company. Sterling's condition continued to deteriorate during this interval. At approximately 3:00 p.m., while en route to Hopkins, Sterling became unresponsive. The ambulance was diverted to Memorial Hospital in Easton, Maryland, where it was discovered that Sterling had suffered an intraventricular hem-

---

Maternal Consultation/Referral Service to upgrade obstetrical care for mothers in the State.

5. Dr. Gray requested that Sterling be transferred via helicopter. At the hearing below, plaintiffs' counsel represented that the "decision to transport, the medical decision made by Dr. Khouzami, was a deviation in the standard of care." Counsel for Johns Hopkins argued that under MIEMSS protocol at this time pregnant women who were receiving I.V. magnesium sulfate could not be transferred by helicopter.

orrhage. An emergency cesarean section was performed at Easton Memorial Hospital to deliver Sterling's infant daughter. Sterling was airlifted to the University of Maryland where she died on August 5th as a result of the hemorrhage.

This litigation ensued. Before trial in this matter, the defendants filed motions for summary judgment. Johns Hopkins asserted its entitlement to summary judgment because its representative physician, Dr. Khouzami, did not have a physician/patient relationship with Laverne Sterling. Maintaining that this predicate for the hospital's legal duty to the decedent was absent, it contended that it was entitled to judgment as a matter of law.

## Discussion

Appellants maintain that Dr. Khouzami established a physician-patient relationship, and that, as a result, Hopkins had a legal duty toward Ms. Sterling such that it must answer for its negligence. They contest the entry of summary judgment against them, asserting that the question of whether Hopkins owed a duty of care to Ms. Sterling constitutes a genuine issue of material fact. Appellants further aver that a physician-patient relationship was established under the facts of this case, and insist that "face-to-face" contact between a doctor and patient is not a necessary prerequisite for the establishment of the legal relationship between physician and patient. In this case appellants also assert that they have raised genuine issues of material facts that must be resolved at trial, and contend that, as a result, summary judgment would be inappropriate in this instance.

## Summary Judgment

Summary judgment is appropriate where there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Md. Rule 2–501(a). When ruling on a motion for summary judgment, a court must view the facts, including all inferences drawn therefrom, in the light most favorable to the opposing party. *Jones v. Mid–Atlantic Funding Co.*, 362 Md. 661, 676, 766 A.2d 617, 621 (2001). " 'A

material fact is a fact the resolution of which will somehow affect the outcome of the case.' " *Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206, 209 (2001) (quoting *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608, 614 (1985)). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). We are mindful that, as Judge Smith observed in *Porter v. General Boiler Casing Co.*, 284 Md. 402, 396 A.2d 1090 (1979), "if [the] facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law[.]" *Id.* at 413, 396 A.2d at 1096 (quoting *Fenwick Motor Co. v. Fenwick*, 258 Md. 134, 138; 265 A.2d 256, 258 (1970)). But where there is no dispute as to any *material fact presented*, summary judgment is appropriate to resolve purely legal questions. *See, e.g., Hobbs v. Teledyne Movible Offshore, Inc.*, 632 F.2d 1238, 1240 (5th Cir. Unit A 1980).

■ We exercise plenary review over the circuit court's decision to grant summary judgment. *See generally Lippert*, 366 Md. at 227, 783 A.2d at 209.

## General Principles

### I.

■ "The general principles which ordinarily govern in negligence cases also apply in medical malpractice claims." [6]

---

6. Certainly, medical malpractice has evolved as a theory of liability distinct from negligence, because of its incorporation of contract and tort principles. *See St. John v. Pope*, 901 S.W.2d 420, 423 (Tex.1995). Judge Wilner illuminated the interplay between contract and tort theories for the Court of Appeals in *Dingle v. Belin*, 358 Md. 354, 749 A.2d 157 (2000):

  We have long recognized, as have most courts, that, except in those unusual circumstances when a doctor acts gratuitously or in an emergency situation, recovery for malpractice "is allowed only where there is a relationship of doctor and patient as a result of a contract, express or implied, that the doctor will treat the patient with proper professional skill and the patient will pay for such treatment, and there has been a breach of professional duty to the patient." *Hoover*

*Shilkret v. Annapolis Emergency Hospital Association,* 276 Md. 187, 190, 349 A.2d 245, 247 (1975). The Court of Appeals has recently rehearsed the elements for negligence in Maryland:

> In order to establish a claim for negligence under Maryland law, a party must prove four elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."

*Grimes v. Krieger Krieger Institute, Inc.,* 366 Md. 29, 85, 782 A.2d 807, 841 (2001) (footnote and emphasis omitted) (quoting *Rosenblatt v. Exxon,* 335 Md. 58, 76, 642 A.2d 180, 188 (1994)).

▬ The threshold element is the question of whether the defendant owes a legal duty towards the injured party. Assuming the existence of this element, a plaintiff may establish a *prima facie* case for medical negligence by proving "(1) the applicable standard of care; (2) that this standard has been violated; and (3) that this violation caused the complained of harm." *Jacobs v. Flynn,* 131 Md.App. 342, 354, 749 A.2d 174, 180, *cert. denied sub nom. Kishel v. Jacobs,* 359 Md. 669, 755 A.2d 1140 (2000).

▬ The duty of care owed to an individual in the medical context is based primarily on the existence of the physician-patient relationship. As stated by Judge Karwacki, commenting in a general negligence case in *Valentine v. On Target, Inc.,* 353 Md. 544, 727 A.2d 947 (1999), "[i]nherent . . . in the

---

*v. Williamson,* 236 Md. 250, 253, 203 A.2d 861, 862 (1964). The relationship that spawns the malpractice claim is thus ordinarily a contractual one. Largely because of the greater facility offered by tort-based actions for recovering damages for non-economic loss— predominantly pain, suffering, and disfigurement—malpractice actions have traditionally been tort-based, the tort arising from the underlying contractual relationship. *See Schaefer v. Miller,* 322 Md. 297, 587 A.2d 491 (1991).

The traditional action has been for negligence in the performance (or non-performance) of a course of therapy or a medical procedure. 358 Md. at 367–68, 749 A.2d at 164.

concept of duty is the concept of a relationship between the parties out of which the duty arises." *Id.* at 551, 727 A.2d at 950. We said in *Miller v. Schaefer,* 80 Md.App. 60, 559 A.2d 813 (1989), *aff'd,* 322 Md. 297, 587 A.2d 491 (1991), that "[b]efore a physician may be found liable for an act of medical malpractice, it is essential that a patient-physician relationship be in existence at the time the alleged act occurred." *Id.* at 73, 559 A.2d at 819. It is a basic principle of law that, with the exception of circumstances where a doctor acts gratuitously or in an emergency situation, recovery for malpractice is permitted only when a physician-patient relationship has been established, and that there has been a "breach of professional duty to the patient." *Dingle v. Belin,* 358 Md. 354, 367, 749 A.2d 157, 164 (2000) (quoting *Hoover v. Williamson,* 236 Md. 250, 253–254, 203 A.2d 861, 862 (1964)).

## II.

Maryland has recognized that the existence of a duty constitutes a legal determination. The Court of Appeals in *Valentine* stated:

> Generally, whether there is adequate proof of the required elements needed to succeed in a negligence action is a question of fact to be determined by the fact finder; but, the existence of a legal duty is a question of law to be decided by the court.

353 Md. at 549, 727 A.2d at 949; *see also Davis v. Johns Hopkins Hospital,* 330 Md. 53, 64, 622 A.2d 128, 133–34 (1993). Other jurisdictions are in accord. *See, e.g., Irvin v. Smith,* 272 Kan. 112, ——, 31 P.3d 934, 942 (2001); *Adams v. Via Christi Regional Medical* Center, 270 Kan. 824, 834, 19 P.3d 132, 139 (2001); *St. John v. Pope,* 901 S.W.2d 420, 424 (Tex.1995); *Kirk v. Michael Reese Hospital & Medical Center,* 117 Ill.2d 507, 525, 111 Ill.Dec. 944, 513 N.E.2d 387, 396 (1987); *Lection v. Dyll,* 65 S.W.3d 696, 704 (Tex.App.-Dallas 2001); *Oja v. Kin,* 229 Mich.App. 184, 187, 581 N.W.2d 739, 741 (1998); *Reynolds v. Decatur Memorial Hospital,* 277 Ill.App.3d 80, 84, 214 Ill.Dec. 44, 660 N.E.2d 235, 238 (1996);

*Hill v. Kokosky,* 186 Mich.App. 300, 302, 463 N.W.2d 265, 266 (1990), *appeal denied,* 438 Mich. 873 (1991); *cf. Cohen v. Cabrini Medical Center,* 94 N.Y.2d 639, 642, 709 N.Y.S.2d 151, 730 N.E.2d 949, 951 (2000) (resort to common concepts of morality, logic and social consequences).[7]

### Application of Principles to this Case

We must now decide whether the circuit court erred in concluding, as a matter of law, that a duty did not exist on behalf of Johns Hopkins. Appellants contend that a physician-patient relationship was established between Johns Hopkins Hospital and Laverne Sterling. Indeed, we acknowledge that both Maryland law and the law of other jurisdictions recognize the creation of such a relationship absent an express contract between the physician and patient. Appellants, how-

---

7. There are cases which conclude that "the existence of duty may depend on preliminary questions that must be determined by the fact finder." *Diggs v. Arizona Cardiologists, Ltd.,* 198 Ariz. 198, 200, 8 P.3d 386, 388 (App.2000); *see, e.g., Irvin v. Smith,* 272 Kan. 112, ——, 31 P.3d 934, 940 (2001); *Gallion v. Woytassek,* 244 Neb. 15, 20, 504 N.W.2d 76, 80 (1993); *Eby v Newcombe,* 116 Idaho 838, 840, 780 P.2d 589, 591 (1989); *Lyons v. Grether,* 218 Va. 630, 633, 239 S.E.2d 103, 105 (1977), cited in *Lownsbury v. VanBuren,* 94 Ohio St.3d 231, 243–44, 762 N.E.2d 354, 364 (2002)(Cook, J., concurring). That is, these courts would consider that the issue of whether a physician-patient relationship exists may constitute a factual question. *See also Oliver v. Brock,* 342 So.2d 1, 4 (Ala.1976); *Bienz v. Central Suffolk Hospital,* 163 A.D.2d 269, 270, 557 N.Y.S.2d 139, 139–40 (1990). The Michigan Supreme Court has explained the respective roles of court and jury as follows:

> It is generally agreed that the duty question—"whether, upon the facts in evidence, such a relationship exists between the parties that the community will impose a legal obligation upon one for the benefit of the other"—is to be decided by the court.
>
> . . .
> ... It is for the court to determine, as a matter of law, what characteristics must be present for a relationship to give rise to a duty the breach of which may result in tort liability. It is for the jury to determine whether the facts in evidence establish the elements of that relationship. Thus, the jury decides the question of duty only in the sense that it determines whether the proofs establish the elements of a relationship which the court has already concluded give rise to a duty as a matter of law.

*Smith v. Allendale Mutual Ins. Co.,* 410 Mich. 685, 713–15, 303 N.W.2d 702, 709–10 (1981) (footnotes and citations omitted).

ever, further assert that this Court should find a physician-patient relationship under the facts of this case. We disagree.

It is beyond cavil that a physician-patient relationship may be created through an implied contract. This Court, in *Miller v. Schaefer,* noted:

> The relationship between a physician and patient may result from an express or implied contract, either general or special, and the rights and liabilities of the parties thereto are governed by the general law of contract, although the existence of the relation does not need to rest on any express contract between the physician and person treated. However, the voluntary acceptance of the physician-patient relationship by the affected parties creates a prima facie presumption of a contractual relationship between them.

*Miller v. Schaefer,* 80 Md.App. at 73–74, 559 A.2d at 819 (footnotes omitted) (quoting 61 Am.Jur.2d, *Physicians, Surgeons, Etc.,* § 158 (1981)).

*Miller* does not dictate the results sought by appellants in this case, but articulates in general the rule as to the creation of the physician-patient relationship. We went on to hold in *Miller* that a contractual relationship between the parties arose when the patient accepted the physician's diagnosis and advice on the proper course of treatment. *Id.* at 75, 559 A.2d at 820. This relationship thus created a duty on behalf of the physician to treat the patient properly, as well as a duty to inform the patient as to the procedure to be used and risks involved. *Id.*

## Appellants' Cases: *McKinney and Wheeler*

Appellants rely on two cases from other jurisdictions, which closely resemble the facts before us, to urge that we rule that a physician-patient relationship existed between Ms. Sterling and the appellees, thus leading to the conclusion that Hopkins owed a duty of care to her.

In *Wheeler v. Yettie Kersting Memorial Hospital,* 866 S.W.2d 32 (Tex.App.-Houston [1st Dist.] 1993, no writ), the patient, Mrs. Wheeler, then eight months pregnant, contacted

emergency medical technicians (EMTs) to transport her to John Sealy Hospital, located 90 miles away in Galveston.[8] The EMTs first took her to the Yettie Kersting Memorial Hospital in Liberty, Texas, the nearest medical facility, for an assessment to determine whether she could safely travel to John Sealy. One of the EMTs was doubtful about Mrs. Wheeler's chances of making the journey without giving birth.

Upon her arrival at Yettie Kersting, Mrs. Wheeler was assessed by two nurses. Their findings were communicated by telephone to Dr. Rodriguez, an on-call general practitioner with staff privileges. The nurses also telephoned John Sealy Hospital and communicated the information to an unidentified doctor there. That doctor instructed them to transport the patient "on her side" to John Sealy. Dr. Rodriguez approved the transfer. Both EMT technicians expressed concern about the journey, but were instructed by a nurse to "put the patient in the ambulance, turn on the lights and sirens and go." 866 S.W.2d at 35. During the course of the trip, there was a breech birth, and the baby died.

Mrs. Wheeler subsequently brought suit against both hospitals and the staff of Yettie Kersting. The hospitals subsequently moved for summary judgment and the trial court granted the motion on all causes of action. The case eventually was presented to the First District Court of Appeals in Houston on the basis of certain counts disposed of in summary judgment. One such issue concerned the relationship that existed between Dr. Rodriguez and the appellant. In concluding that a physician-patient relationship existed between the parties, the Court stated:

> Dr. Rodriguez was not asked, nor did he refuse to come in to examine the patient. Instead, he was asked to evaluate certain information and make a medical decision ... [H]e willingly agreed to do so. We conclude that in evaluating the status of Mrs. Wheeler's labor and giving his approval,

---

**8.** The record in *Wheeler* suggests that the plaintiff had already been a patient with the "transferee" hospital, John Sealy Hospital, because that institution had her medical records. *See* 866 S.W.2d at 38.

[Dr. Rodriguez] established a doctor-patient relationship with Mrs. Wheeler and accepted the duties which flow from such a relationship, specifically the duty to comply with the applicable standard of care for a physician in an on-call capacity at a rural hospital in transferring an obstetrical patient to a distant facility.

*Id.* at 39–40.

The Court further noted:

It is axiomatic that a doctor-patient relationship may arise from, briefly exist, and be limited by the unique circumstances presented in a transfer situation. Otherwise, a hospital's requirement for physician approval of patient transfers would require the patient to subject herself to the physician's medical decision whether to transfer her without imposing any obligation on the physician to make that decision in a responsible manner.

*Id.* n. 6. The Court of Appeals reversed the summary judgment that had been entered in favor of Dr. Rodriguez on the basis that no physician-patient relationship had existed. 866 S.W.2d at 40.

Appellants also advance as support for their position the opinion from the Ohio Court of Appeals in *McKinney v. Schlatter*, 118 Ohio App.3d 328, 692 N.E.2d 1045 (1997), to propose that a physician-patient relationship be created by implication under the circumstances found here. The Ohio Court of Appeals determined that the "lack of direct contact" between patient and doctor does not preclude the establishment of a physician-patient relationship. It established a three-part test to gauge whether such a relationship would come into existence:

We therefore hold, and in doing so are mindful that we are elaborating in the field of medical malpractice, that a physician-patient relationship can exist by implication between an emergency room patient and an on-call physician who is consulted by the patient's physician but who has never met, spoken with, or consulted the patient when the on-call physician (1) participates in the diagnosis of the patient's

condition, (2) participates in or prescribes a course of treatment for the patient, and (3) owes a duty to the hospital, staff or patient for whose benefit he is on call. Once an on-call physician who has the duty to the hospital, its staff, or patients is contacted for the benefit of an emergency room patient, and a discussion takes place between the patient's physician and the on-call physician regarding the patient's symptoms, a possible diagnosis and course of treatment, a physician-patient relationship exists between the patient and the on-call physician.

*Id.* at 336–37, 692 N.E.2d at 1050.

In *McKinney,* a patient sought treatment at a hospital due to chest and abdominal pains. The attending physician examined the patient and conducted tests but could not confirm the nature of the pains. Consequently, he telephoned the home of the on-call cardiologist, who had a duty to the hospital. After discussing the symptoms, test results, and X-rays, the cardiologist concluded that the problem was not cardiac in nature. He requested more testing, after which he reiterated his opinion that the problem was not cardiac in nature. The cardiologist advised the attending physician to continue observation, and that physician thereafter instructed the patient to make an appointment with his family doctor and discharged him. The patient subsequently died of an aortic aneurysm.

On appeal from a directed verdict against the patient's estate in subsequent litigation, the Ohio Court of Appeals, in applying its "three-pronged" test, concluded that "reasonable minds" could come to different conclusions as to whether a physician-patient relationship existed "between the principals in that case." The doctor "participated in McKinney's course of treatment," the Court said, even "participat[ing in the course of treatment] . . . negatively by precluding cardiac treatment. . . ." 118 Ohio App.3d at 337, 692 N.E.2d at 1051. The cardiologist had been consulted by the attending physician "for the purpose of ruling out a heart attack." He discussed the patient's test findings and information with the attending physician. The Court of Appeals was also impressed by the fact that the doctor in question was "on-call for

his group." *Id.* The Court of Appeals subsequently reversed the directed verdict that had been entered for the defendant cardiologist on the grounds that a relationship had been formed under its three-pronged test.

The Ohio Supreme Court has subsequently rejected the *McKinney* three-part test. In *Lownsbury v. VanBuren*, 94 Ohio St.3d 231, 762 N.E.2d 354 (2002), that court was faced with the issue of whether a supervisory physician at a teaching hospital may be held to a physician-patient relationship even where that doctor had neither direct nor indirect contact with the patient. Even though the recognition of a duty of care in the context of a supervisory physician for a teaching hospital presents a relatively unique situation, the court's discussion and review of authorities which do not involve direct patient-physician contact is helpful.

The lower court in *Lownsbury* had concluded that there was insufficient evidence to raise a genuine issue of material fact as to the existence of a physician-patient relationship. Among the authorities brought to that court's attention was *McKinney* and its three-part test for a physician-patient relationship. The Ohio Supreme Court then explained what the Court of Appeals had stated in *McKinney*:

> ... The court in *McKinney* did not hold that a physician-patient relationship can be created despite the lack of *any* contact between the physician and the patient. Instead, the court found that the "lack of *direct* contact between the patient and the on-call physician does not, in itself, preclude a physician-patient relationship."
>
> ... [T]he *McKinney* test requires the plaintiff to show that the physician actually participated in the patient's care and was obligated to do so. In other words, even where an on-call physician is contractually obligated to perform the services at issue, the physician-patient relationship cannot be established unless it appears that the physician was actively involved in caring for the patient.

94 Ohio St.3d at 240, 762 N.E.2d at 361–62. After explaining the *McKinney* three-part test, the Ohio Supreme Court then

rejected it, finding the test to be "incongruous, for it actually subsumes the ultimate question of duty." *Id.*

The Ohio Supreme Court concluded, after surveying pertinent case law, that the "basic underlying concept is that a physician-patient relationship, and thus a duty of care, may arise from whatever circumstances evince the physician's consent to act for the patient's benefit." *Id.* at 238, 762 N.E.2d at 360. Such consent may take the form of a physician's accord with an institution to provide care for its patients, or "certain actions that indicate knowing consent, such as examining, diagnosing, treating, or prescribing treatment for the patient." *Id.* at 240, 762 N.E.2d at 362. The court further concluded that physicians who practice in the "institutional environment may be found to have voluntarily assumed a duty of supervisory car e[.]" *Id.* at 238, 762 N.E.2d at 360.

### Other Cases

There is a paucity of Maryland authority that addresses the formation of a physician-patient relationship where there is no direct contact with the patient. There are, however, numerous decisions from other courts that will help us to navigate to avoid Scylla without being gulped by Charybdis. In *Prosise v. Foster*, 261 Va. 417, 544 S.E.2d 331 (2001), the issue was "whether an on-call attending physician for a teaching hospital owed a duty of care to a patient based upon a physician-patient relationship in the absence of direct contact with or consultation concerning the patient." 261 Va. at 419, 544 S.E.2d at 331. Dr. Foster, the on-call physician to the hospital emergency room, although not physically present, was available to answer questions from treating residents and interns.

The child was taken to the hospital with chicken pox lesions in her mouth. She was examined by two residents, who did not call Dr. Foster, and was treated for dehydration and released with instructions that she be taken to her pediatrician the following day. The next day, her pediatrician ordered the child returned to the hospital. Dr. Foster then saw the child for the first time, determined that she suffered from an

infection due to a systemic effect of the chicken pox, and ordered IV anti-viral medication. This treatment was unsuccessful, and the child died.

In the resulting malpractice action, the trial court entered judgment in favor of the doctor, ruling that "there was no 'minimum contact' between Dr. Foster and [the child] and, therefore, no physician-patient relationship existed[ ]" when the doctor was "on call." The plaintiffs appealed, asserting that such a relationship did exist because Dr. Foster agreed to be on-call, thus accepting the child as her patient. The Virginia Supreme Court disagreed. The plaintiffs also asserted that a provision of the Virginia Code, which requires that medical students may work in hospitals only under supervision of a licensed physician, and that the "attending physician" retains the responsibility to assure the completion of a History and Physical by a licensed physician, created a statutory physician-patient relationship. Again, the Virginia Court disagreed. 261 Va. at 422, 544 S.E.2d at 333.

The plaintiffs then urged the Virginia court to follow the decision by the North Carolina Supreme Court in *Mozingo v. Pitt County Memorial Hospital,* 331 N.C. 182, 415 S.E.2d 341 (1992). That court held that an on-call attending physician had a common law duty to supervise residents who provided medical care, even though the supervision did not fit traditional notions of the physician-patient relationship. The defendant physician in *Prosise,* on the other hand, relied on this Court's decision in *Rivera v. Prince George's County Health Dept.,* 102 Md.App. 456, 649 A.2d 1212 (1994), *cert. denied,* 338 Md. 117, 656 A.2d 772 (1995), which disagreed with the North Carolina Supreme Court, stating that it would impose no duty in the absence of proof that the doctor had accepted the patient, or had been summoned for consultation or treatment, "unless the 'on-call' agreement between a hospital and a physician provides otherwise." 102 Md.App. at 498, 649 A.2d at 1232.

In upholding the trial court, the Virginia Supreme Court agreed with this Court's analysis in *Rivera,* and determined

that it must "look to the record to determine whether it contains any facts which indicate that Dr. Foster, by virtue of her actions or her status as the on-call attending physician for the [hospital], agreed to accept responsibility for the care of [the child]." 261 Va. at 423, 544 S.E.2d at 334. The Supreme Court concluded that the trial court did not err in holding that there was no physician-patient relationship "because the evidence failed to show a consensual relationship in which the patient's care was entrusted to the [on-call] physician and the physician accepted the case." *Id.* at 424, 544 S.E.2d at 334. The Court noted that Dr. Foster did not participate in any treatment decisions, and had not been consulted by the treating physician or staff about the patient's condition.

In *Irvin v. Smith*, 272 Kan. 112, 31 P.3d 934 (2001), the patient brought a malpractice action against, *inter alia*, a child neurologist who had been consulted in connection with an undiagnosed ventriculoperitoneal shunt malfunction. The patient was a 12–year old who had received a shunt shortly after birth in order to relieve cerebral fluid pressure. She started to develop flu-like symptoms and seizures, and neck and back pain. She originally was admitted to a hospital in Ulysses, Kansas, then transferred to a medical center in Kansas City. Tests showed no abnormalities, and the patient was discharged.

The patient developed the same problems the following month. Some x-rays and other diagnostic procedures up to this point had yielded negative results, but when the patient was admitted to Wesley Medical Center, radiographs showed that the shunt was in need of repair. The treating physician could not recall whether he had seen the films which demonstrated this condition. The treating physician called the neurologist for a "consult." They discussed performing a shuntogram the following day to determine whether there had developed any blockage. Before this procedure was conducted the next morning, the patient developed severe symptoms, and suffered permanent and severe brain damage. A lawsuit was filed on her behalf.

The trial court granted summary judgment in favor of the neurologist, ruling that a physician-patient relationship had not been established in his case. On appeal, the Kansas Supreme Court affirmed. The Court initially observed that the question of whether a physician-patient relationship exists is a question of fact. The Court also stated:

> The existence of the duty of care is dependent on the existence of a physician-patient relationship.... [citing cases]
>
> . . .
>
> Courts have concluded, as has this court, that whether a physician-patient relationship exists is generally a question of fact for the jury.... [citing cases]
>
> . . .
>
> Generally, a physician-patient relationship is created only where the physician personally examines the patient.... A physician's indirect contact with a patient, however, does not preclude the finding of a physician-patient relationship.... Indeed, an implied physician-patient relationship may be found where the physician gives advice ... through another health care professional. [citing case]
>
> A physician who gives an "informal opinion," however, at the request of a treating physician, does not owe a duty to the patient because no physician-patient relationship is created. [citations] A physician who assumes the role of treating the patient, however, can be liable for medical malpractice.

*Irvin,* 272 Kan. at ——, 31 P.3d at 940–41. The Court concluded that "the doctor must take some affirmative action with regard to treatment of a patient in order for the relationship to be established." *Id.*

The Court determined that no duty had been created-no physician-patient relationship had been established. The neurologist had not examined the patient, nor had he reviewed her chart or spoken with her parents. His sole source of information was what had been relayed to him by the treating

physician. He entered no orders in the case and took no other action.

The *Irvin* Court noted that courts have taken public policy concerns to heart and have refused to extend liability to doctors who have acted solely as an informal consultant, even where their participation in the case is extensive. *See NBD Bank v. Barry*, 223 Mich.App. 370, 566 N.W.2d 47 (1997), *appeal denied*, 458 Mich. 864, 582 N.W.2d 835 (1998) (attending physician contacted the consultant frequently, and consultant viewed patient's chart, and made recommendations, which treating physician was free to accept or reject).

In *Adams v. Via Christi, ante,* the Kansas Supreme Court determined that the consultant owed a duty to the patient in that case, and was thus subject to liability. The consultant in *Adams* discussed the case with the decedent's mother, who had called him about her daughter's pregnancy, and offered a medical opinion. He had been the treating family physician and the court concluded that his earlier physician-patient relationship was "renewed." The doctor had "tak[en] some action to give medical assistance." *Id.* at 837, 19 P.3d at 141.

In *Oja v. Kin,* 229 Mich.App. 184, 581 N.W.2d 739 (1998), *appeal denied*, 459 Mich. 988, 593 N.W.2d 559 (1999), the Michigan Court of Appeals held that a doctor's consent to form a physician-patient relationship may not be implied merely from the doctor's status as an on-call physician.

The plaintiff's decedent had been brought to the Oakland Hospital emergency room with a gunshot wound to the jaw. The defendant osteopath was the on-call ENT specialist whom the attending physician had called for assistance. When reached at home with details about this emergency, he refused to come to the hospital, claiming that he was ill. The resident on duty at the emergency room called Dr. Kin twice more. Each time that "on-call" expert declined to come to the hospital. The patient was examined by a number of physicians at the hospital before transfer to the Detroit Receiving Hospital, where he died in surgery.

The executrix filed suit against Dr. Kin and others, asserting negligence. The trial court granted summary disposition for the doctor. The plaintiff appealed, and contended that she raised a genuine issue of material fact regarding the existence of a physician-patient relationship between the doctor and her decedent. She advanced alternative theories for recovery: the doctor formed a physician-patient relationship because he rendered advice and treatment during his conversations with the resident on duty, and the doctor was bound by a contractual relationship with the hospital, and that this created a legal duty to hospital patients when called.

The Michigan Court of Appeals observed that the "existence or nonexistence of a legal duty is a question of law for the court to decide[,]" without which "there can be no actionable negligence." 229 Mich.App. at 187, 581 N.W.2d at 741. This duty arises from the physician-patient relationship, which "exists where a doctor renders professional services to a person who has contracted for such services." *Id.*

The court stated that "merely listening to another physician's description of a patient's problem and offering a professional opinion regarding the proper course of treatment is not enough." Here, the doctor offered "informal assistance to a colleague." *Id.* at 190–91, 581 N.W.2d at 743. The court added, however:

> At the other end of the spectrum, a doctor who is on call and who, on the phone or in person, receives a description of the patient's condition and then essentially directs the course of that patient's treatment, has consented to a physician-patient relationship.

229 Mich.App. at 191, 581 N.W.2d at 743. The court noted that this requires a case by case analysis, but concluded that a "physician's on-call status alone [is not] enough to support an implied consent to a physician-patient relationship." *Id.* The doctor had provided no care, treatment or advice to the decedent and, unlike the on-call physician in *McKinney,* the doctor here "did not take any action that would support a finding of implied consent." *Id.* at 192, 581 N.W.2d at 743.

The court affirmed the entry of summary disposition against the decedent's personal representative, notwithstanding that hospital bylaws required an on-call physician to take part in the care of patients or arrange for coverage. *See id.* at 194 n. 7, 581 N.W.2d at 744 n. 7.

In *Reynolds v. Decatur Memorial Hospital,* 277 Ill.App.3d 80, 214 Ill.Dec. 44, 660 N.E.2d 235 (1996), the Illinois Appellate Court entertained an appeal from the entry of summary judgment in favor of a physician. According to the appellate court, the sole issue was whether,

> as a matter of law, a telephone conference between [the] treating pediatrician ... and [Dr. Thomas] Fulbright concerning [patient's] condition created a physician-patient relationship between [patient] and Fulbright so as to raise a duty which is enforceable in a medical malpractice action in light of the standards of protocol of the hospital at which [patient] was being treated and in which both physicians were allowed to practice.

277 Ill.App.3d at 81, 214 Ill.Dec. 44, 660 N.E.2d at 236.

The appellate court affirmed the trial court's finding that no duty existed. The minor plaintiff was injured at home after a fall from a couch and was taken to the emergency room, where he was admitted for observation and further inquiry into his condition. He exhibited an abnormal breathing pattern and tests were conducted to discover a possible infection or other problem. Cervical spine x-rays appeared to be normal. The child was admitted to the hospital and a pediatrician summoned to examine him.

That pediatrician contacted a Dr. Fulbright to discuss this case. The latter suggested a spinal tap to determine the involvement, if any, of certain disease processes. The pediatrician did not ask Dr. Fulbright to treat the child, and Dr. Fulbright did not commit to further involvement with his case. Dr. Fulbright later stated that he offered to make himself available if the child's doctor wished. He recalled that he would "often receive[ ] inquiries from other doctors asking

questions and seeking suggestions." *Id.* at 83, 214 Ill.Dec. 44, 660 N.E.2d at 237.

The spinal tap was performed the next morning shortly after 3:00 a.m. The pediatrician had wanted to consult again with Dr. Fulbright when she arrived at the hospital later in the morning, but was informed that he was in surgery and unavailable. Dr. Fulbright never received a message that had been posted in the patient's chart the previous evening.

The appellate court articulated the standard for determining whether a duty exists:

The determination of whether a duty exists—whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff—is an issue of law to be determined by the court.

277 Ill.App.3d at 84, 214 Ill.Dec. 44, 660 N.E.2d at 238 (quoting *Kirk v. Michael Reese Hospital & Medical Center,* 117 Ill.2d 507, 525, 111 Ill.Dec. 944, 513 N.E.2d 387, 396 (1987)).

The appellate court explained that "[a] physician's duty is limited to those situations in which a direct physician-patient relationship exists or there is a special relationship[.]" *Id.* at 85, 660 N.E.2d at 239. The court ruled in this case that there was no direct physician-patient relationship, no special relationship, and "hence no duty owed to plaintiffs by [Dr.] Fulbright." *Id.* The court pointed out that this was not a case in which Dr. Fulbright was asked to provide a service, conduct laboratory tests, or review test results. *Id.* The doctor did not accept a referral, and did not undertake to direct the actions of hospital employees. Dr. Fulbright was not contacted again, and he charged no fee. The appellate court also distinguished *Wheeler,* stating that this was not "a case in which a physician undertook to direct the action of hospital employees in a telephone conversation with an emergency room nurse." 277 Ill.App.3d at 85, 660 N.E.2d at 239 (distinguishing *Wheeler*).

**Maryland Cases**

**I.**

This Court had the occasion to address the existence of physician-patient relationships in the absence of direct contact in *Rivera.* The parents of a child born with birth defects brought suit against the hospital where the baby had been delivered, the Prince George's County Health Department and others asserting that the defendants were negligent in connection with the mother's treatment. Among the issues that were implicated in that case was the "on-call" status of a defendant physician, who had been available to render assistance if called. That doctor was effectively an independent contractor, who was "on-call" for about two weeks each year. Judge Cathell wrote for this Court to outline the physician's functions:

> In the absence of an express agreement, "on-call" means nothing more than that. He did not exercise control over [hospital residents'] actions on a regular basis. Moreover, in our view, the relationship extant here cannot be construed as a supervisory situation whereby the resident's knowledge is imputed to Dr. Oh. He was merely to be consulted "regarding any complications that the residents encountered in caring for obstetrical patients" and, theoretically, in that two week period, had the residents not experienced any complications in their routine, Dr. Oh would not have any knowledge of who had and had not been treated and the manner in which they had been treated. Indeed, the morning of September 8, 1978 was the first time he was made aware of Ms. Rivera's condition. Following the child's delivery, he had no further contact with her or her mother in any capacity—nor was such contact required.

102 Md.App. at 482–83, 649 A.2d at 1225.

We observed in that case that the duties of "on-call" physicians had not received significant appellate attention up to that point. We then discussed the opinions by the North Carolina Supreme Court and the North Carolina Court of Appeals in *Mozingo v. Pitt County Memorial Hospital, Inc.,*

331 N.C. 182, 415 S.E.2d 341 (1992) and *Mozingo v. Pitt County Memorial Hospital, Inc.,* 101 N.C.App. 578, 400 S.E.2d 747 (1991). The North Carolina Supreme Court stated in *Mozingo:*

> [I]n the increasingly complex modern delivery of health care, a physician who undertakes to provide on-call supervision of residents actually treating a patient may be held accountable to that patient, if the physician negligently supervises those residents and such negligent supervision proximately causes the patient's injuries.
>
> . . .
>
> . . . the defendant has stipulated that he undertook the duty of on-call supervision of—not merely consultation with—the resident physicians.

331 N.C. at 189, 192, 415 S.E.2d at 345. This Court disagreed with the approach taken by the courts in *Mozingo,* instead aligning itself with the dissenting opinions in each case, which were critical of imposing on a supervisory physician liability for injuries to a patient "whom he has never treated, never met, and never agreed to treat[.]" 102 Md.App. at 487, 649 A.2d at 1227 (quoting *Mozingo,* 331 N.C. at 193, 415 S.E.2d at 347–48 (Meyer, J., dissenting)).

We likewise distinguished our Court of Appeals's opinion in *Thomas v. Corso,* 265 Md. 84, 288 A.2d 379 (1972), as factually inapposite. In *Thomas,* the on-call physician was contacted by the hospital emergency room's registered nurse. He advised the nurse to admit the patient and outlined the treatment to be administered. That hospital employed no residents or interns, but instead relied on private physicians using an "on-call" roster. The "on-call" physician was therefore the only doctor available.

The patient in *Thomas* died after admission. The on-call doctor, who lived only ten minutes away, waited three hours to come in, and then only when notified that the patient was dying. The Court of Appeals noted that the patient had been accepted by the doctor as his patient. 265 Md. at 102, 288 A.2d at 390.

Unlike the on-call doctor in *Thomas,* the physician in *Rivera* arrived promptly when summoned.[9]  He was too late to assist because he had not been called earlier, and thus had no occasion to "accept" that patient.  This Court concluded:

> We hold that, unless the "on call" agreement between a hospital and a physician provides otherwise, an "on call" physician who has not accepted a patient or has not, pursuant to his "on call" status, consulted with a treating or attending physician in regards to the patient, or has not been summonsed pursuant to his "on call" agreement to consult with an attending physician or attend or treat a patient, is not liable for the negligence of others occurring during the "on call" but unsummonsed period.  Were we to hold otherwise, we would be imposing the threat of liability on every physician for *all* patients that are treated at the Hospital during the time they are "on call."

102 Md.App. at 498, 649 A.2d at 1232.

## Existence of Duty in this Case

In the final analysis, we take it as well-settled that a physician-patient relationship may arise by implication where the doctor takes affirmative action to participate in the care and treatment of a patient.  An "on-call" physician may be in the position to direct the care of a patient whom he has never seen, so that his or her instructions are followed, the results of which are manifest in the ensuing course of the patient's treatment.  But "[w]here ... the treating physician exercises his or her own independent judgment in determining whether to accept or reject [a consultant's] advice, ... the consultative physician should not be regarded as a joint provider of medical services with respect to the patient." *Gilinsky v. Indelicato,* 894 F.Supp. 86, 92 (E.D.N.Y.1995).  We recognize as well that in some circumstances a consultant may undertake by

---

9.  The physician in *Thomas* is similar to the doctor in *Hiser v. Randolph,* 126 Ariz. 608, 617 P.2d 774 (App.1980), which likewise involved a local physician who was on-call and failed to follow-through with his on-call duties.

contract to take this "affirmative" action, and by that accord be deemed to participate in the care and treatment of patients. This appears to have been the case in *Thomas*, where the on-call physician's duty to the hospital and its patients was not in dispute.[10]  For the reasons expressed below, however, we conclude that a physician-patient relationship has not been established in this case and the entry of summary judgment in favor of Johns Hopkins Hospital was appropriate.

We are unaware of any case that addresses the liability of a hospital that has accepted the transfer of a patient without having any direct contact with that patient.[11]  With a bending sail we glide rapidly across domains scarcely seen and like so many intrepid courts before us, begin charting a course through these new legal seas.  We realize that to venture we may fail, but not to venture we have failed already.  We will begin by analyzing the interrelationship between PRMC and Dr. Gray, the primary physician, and Johns Hopkins and Dr. Khouzami.  The following excerpt from the deposition of Dr. Gray is enlightening:

> Q · Did you make a diagnosis of severe pre-eclampsia at 10:50, Doctor?
>
> A  Yes.
>
> Q  Did you make a diagnosis of HELLP syndrome at 10:50?
>
>  . . .
>
> A  12:33. . . .

---

**10.**  As pointed out by a Texas Court of Appeals, "[a] physician may agree in advance with a hospital to the creation of a physician-patient relationship that leaves him no discretion to decline treatment of the hospital's clients." *Lection v. Dyll*, 65 S.W.3d 696, 704 (Tex.App.-Dallas 2001, pet. den.) (op. on reh'g); *accord, Pope*, 901 S.W.2d at 424.

**11.**  *Compare Davis v. Johns Hopkins Hospital*, 330 Md. 53, 622 A.2d 128 (1993) (allegation of harm due to delay in admission).  *But see Johnson v. University of Chicago Hospitals*, 982 F.2d 230 (7th Cir.1992) (agrees that hospital, whose operator declined to admit patient because hospital was on "bypass" status, owed duty because it voluntarily assumed responsibilities of resource hospital which included telemetry operations established under Illinois EMS law).

. . .

Q   Was the telephone call [to Hopkins at 12:30], in your mind, Doctor, made as a referral, or as a consultation or a combination? What is it?

A   Somewhat a combination.

Q   A combination of consultation and referral?

A   Yes.

. . .

Q   So you are going to get, you are going to discuss it, and then to use the vernacular, you are going to call the shot? It is your decision?

A   Probably not.

Q   Probably not?

A   No.

. . .

A   As it turns out, like I say, that act, we make the referral, but the mode of referral, the mode of transport, it becomes out of our hands. I mean, that is determined on this shore, not our shore.

Q   I understand all that, Doctor, but you have to make the decision as the what, if somebody, if a consultant recommends something to you, and you are the primary physician, you still make the decision with the hands on the patient whether to do it or not?

A   I'm the one looking at the patient.

Q   You are the one looking at the patient. You are the one calling the shots. If somebody told you this patient could go by ambulance, and they are going to stop off at Easton for lunch, you might say I'm not shipping this patient. The patient is unstable. I don't have time for that. We are going to have a baby here. You might say that?

A   That's right.

Q   That is well within your discretion? You have the power to do that?

A   That's true.

Q   You can override anything that somebody from Hopkins says?

A   That's correct.

. . .

Q   Do you, Doctor, testify today that you told the Hopkins personnel that this was, indeed, an emergency?

A Yes.

Q   Did you tell the Hopkins people that you believed that this patient, not that you believed, that you had made a diagnosis of severe pre-eclampsia, and you believed the patient had HELLP syndrome?

A   Yes.

Q   Doctor [Khouzami] calls you at 1:20. Do you have any new information by 1:20 to tell him?

A   Yes. Do you want me to read my note?

. . .

Doctor [Khouzami] returned call, had been presented patient. Urinary output 10 ccs last, so we are, obviously, with pre-eclampsia, we developed—that is off the note. Blood pressure stable. I have the flow sheet here just to clarify that.

This was 1 o'clock. At 1 o'clock her blood pressure is 160 over 87, 138 over 87. So it was in that range. Patient remains lethargic secondary to Morphine. Dr. [Khouzami] feels ground transport, (ambulance), acceptable, will arrange ASAP. That is the note.

The excerpt shows that Dr. Gray had reached the diagnosis that Ms. Sterling was pre-eclamptic prior to Dr. Gray's initial contact with Johns Hopkins, and added the diagnosis of HELLP syndrome before he conversed with Dr. Khouzami when the latter returned his call. Indeed, by the time Dr. Gray called Dr. Khouzami, the record suggests that her condition was also characterized as severe. Although Dr. Khouzami acknowledged that he, too, had rendered diagnoses of pre-eclampsia with the HELLP complication, Dr. Gray had

already reached these conclusions before discussing the case with the Hopkins attending physician. Dr. Gray had reached a firm conclusion regarding Ms. Sterling's condition and Dr. Khouzami did nothing to add to this diagnosis of the patient or prepare a course of treatment.

Appellants urge that Dr. Khouzami's deposition testimony virtually dictates a reversal of the summary judgment in favor of Johns Hopkins. Indeed, Dr. Khouzami responded in the affirmative when asked "were you to make the decision as the fellow as to whether or not a patient like Laverne Sterling was transported to the Johns Hopkins Hospital back then?" He reiterated that he "gave permission for the transport . . . [and] approved the transport based on the information [he] had[.]" Dr. Khouzami also said yes when asked whether he "ha[d] two patients?" His deposition testimony also indicates that he rendered a diagnosis of severe pre-eclampsia, and "felt that the patient [was] stable to be transported to Hopkins to be delivered at Hopkins where there is a neonate intensive care unit and more expertise for management of severe preeclampsia."

Dr. Khouzami did agree to have a patient with severe pre-eclampsia and HELLP transported two and a half hours by ambulance.[12] Certainly, Dr. Gray was reluctant to send Ms. Sterling by ambulance, and wanted to move her by helicopter, and Dr. Khouzami recalled that Dr. Gray would make the "determination as to whether it would be appropriate or within the standards of care to have the patient moved[.]"

But we are not persuaded that Dr. Khouzami's deposition testimony bears the weight assigned to it by appellants or compels the result appellants seek. Notwithstanding Dr. Khouzami's testimony, it was Dr. Gray, the physician with direct contact with Ms. Sterling, who rendered the initial diagnoses in this case and who initiated contact with Hopkins

---

12. We note as well that a document, which is described by the parties in their index to the Record Extract as the "Maternity (High Risk) Protocol [Protocol]," recommends a consultation when transport may be necessary.

for transfer. Dr. Gray was "the one looking at the patient[, and he could] override anything that somebody from Hopkins sa[id.]" It is likewise important that Dr. Gray, who was demonstrably Ms. Sterling's attending physician, could override Dr. Khouzami. He was free to accept or reject the directions from Hopkins by deciding not to send Ms. Sterling in the first place. *See, e.g., Lopez v. Aziz,* 852 S.W.2d 303, 307 (Tex.App.-San Antonio 1993, no writ) (treating physician free to accept or reject opinion as he saw fit); *accord Hill v. Kokosky,* 186 Mich.App. at 304, 463 N.W.2d at 267. We hold that, regardless of Dr. Khouzami's testimony, Dr. Gray's acknowledgment that he had the final say in making the decision to transfer Ms. Sterling constitutes a crucial factor in this case which militates against the imposition of a duty of care on Dr. Khouzami and his employer Johns Hopkins Hospital. Dr. Khouzami's deposition testimony does not force a genuine issue of material fact as to whether he played any role in the diagnosis of Ms. Sterling's condition, or held crucial decisional authority as to her transfer.

In this regard we note a crucial distinction between *Wheeler* and the instant appeal. In *Wheeler,* the consulting doctor was contacted by nurses at Yettie Kersting Hospital.[13] There would be no occasion for the imposition of that duty of care on a health professional who is not a physician. It was the consultant in *Wheeler* who held staff privileges there, who evaluated information provided by those duty nurses and who made the decision to transfer that patient. That physician's directives were not merely hortatory, they were conclusive.

---

13. As we have previously noted, the Illinois Appellate Court, in *Reynolds v. Decatur Memorial Hospital,* 277 Ill.App.3d 80, 214 Ill.Dec. 44, 660 N.E.2d 235 (1996), likewise distinguished *Wheeler,* stating that this was not "a case in which a physician undertook to direct the action of hospital employees in a telephone conversation with an emergency room nurse." 277 Ill.App.3d at 85, 214 Ill.Dec. 44, 660 N.E.2d at 239. The distinction applies with equal force to the instant case. In *Thomas v. Corso,* the Court observed that the on-call physician who neglected to go to the hospital to see a patient stated that he was "no more competent than the nurse [on duty with the patient] to make observations but [that a doctor] was more competent to put the observations all together to make a diagnosis." 265 Md. at 93, 288 A.2d at 385.

The instant circumstances differ sharply from *McKinney* and *Wheeler* in another respect. Dr. Khouzami was not directly affiliated in any manner with PRMC, the hospital that was providing immediate care for Ms. Sterling. Thus, Dr. Khouzami owed no independent consultative duty to PRMC, its staff or patients with respect to the care and treatment of individual patients. As stated previously, while Dr. Khouzami did conclude that the diagnosis and treatment given to Ms. Sterling at PRMC was appropriate, he did not give any advice that would cause Dr. Gray or the staff at PRMC to rely on his expertise. Dr. Khouzami, in essence, merely conveyed the fact that Johns Hopkins had the facilities and staff to treat that appellant if she was transferred.

To summarize, Hopkins, through its agent, confirmed a diagnosis of a patient it had no contact with whatsoever, confirmed that the treatment given was appropriate and agreed to a transfer of that patient. None of these actions were binding upon the primary physician, who could observe that patient's deteriorating condition. Hopkins has no affiliation with PRMC or PRMC's staff and no preexisting responsibilities to PRMC's patients.

We thus cannot assume that a hospital accepting a transfer owes the same duties as the transferring hospital, as the accepting hospital is not currently treating the patient and thus has not established a responsibility towards the patient. Furthermore, the accepting hospital is unable to examine the patient to make informed decisions. We will not extend to such hospitals a duty of medical care where the patient remains under the supervision and care of her treating or attending physician.

Under the unique facts of this case, we thus do not believe that an implied physician-patient relationship was established between Johns Hopkins and Sterling. Therefore, Hopkins owed no duty of care to Ms. Sterling. In reaching this conclusion, we are not stating that an on-call physician accepting a transfer of a patient for which no direct contact has been made, has no duty of care. Indeed, a physician may have a

duty to act within a standard of care anytime he/she conveys a medical opinion or other directive that indicates an affirmative action in assuming whole or partial responsibility in the care and treatment of a patient. We do not reach that issue. What we are holding is merely that Johns Hopkins, under the facts before us, owed no duty to Laverne Sterling.

## Conclusion

For the reasons set forth above, and aware that no advance has ever been made without controversy, we hold that the circuit court did not err in granting summary judgment on behalf of Johns Hopkins Hospital. A physician-patient relationship was not established between Johns Hopkins Hospital and Laverne Sterling. Consequently, Johns Hopkins owed no duty of care to Sterling and thus appellants cannot recover in this claim for malpractice.[14]

---

14. We note, in passing, Section 1867 of the Social Security Act, the Emergency Medical Treatment and [Active] Labor Act (EMTALA), codified at 42 U.S.C. § 1395dd (2000) [42 U.S.C. § 1395dd (1988 & Supp. IV 1992), in effect in 1993]. "The ... [EMTALA], as added by § 9121(b) of the Consolidated Omnibus Budget Reconciliation Act of 1985, 100 Stat. 164, and as amended, 42 U.S.C. § 1395dd, places obligations of screening and stabilization upon hospitals and emergency rooms that receive patients suffering from an 'emergency medical condition.'" *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 250, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) (per curiam). The EMTALA provides a federal response to "patient dumping" by hospitals that are medicare providers. 42 U.S.C. § 1395dd(e)(2). *See* Joan M. Stieber & Linda J. Spar, *EMTALA in the 90's—Enforcement Challenges*, 8 HEALTH MATRIX 57, 59–60 (1998). EMTALA is not limited to indigent patients, *see Baber v. Hospital Corp. of America*, 977 F.2d 872, 880 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.*, 290 U.S.App. D.C. 31, 34, 933 F.2d 1037, 1040 (1991) (no distinction between persons with and without insurance; plain language extends protections to "*any* individual" who seeks emergency room assistance), although "patient dumping," as broadly defined, occurs when a hospital refuses medical treatment or improperly transfers a patient on account of inability to pay. *See Matter of Baby K,* 16 F.3d 590, 593 (4th Cir.), *cert. denied sub nom. Baby K. v. Ms. H.*, 513 U.S. 825, 115 S.Ct. 91, 130 L.Ed.2d 42 (1994).

"EMTALA does not provide a cause of action for routine charges of misdiagnosis or malpractice." *Vickers v. Nash General Hospital, Inc.*, 78 F.3d 139, 143 (4th Cir.1996). But a person who "suffers personal harm as a direct result" of a hospital's failure to meet the requirements

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**

---

under EMTALA may bring a civil action seeking damages and appropriate equitable relief against the participating hospital. 42 U.S.C. § 1395dd(d)(2)(A). EMTALA dictates that the hospital may not transfer an unstabilized patient to another facility unless the patient requests the transfer, or a physician certifies that the benefits of the transfer outweigh the risks. 42 U.S.C. § 1395dd(c). EMTALA has not been introduced by the parties to this litigation. But we advert to this statute because of its legislative recognition, by the imposition of screening and pre-transfer certification obligations, of the crucial responsibilities of healthcare professionals at the patient's bedside. We otherwise do not decide whether EMTALA would apply in this case. *Compare Davis v. Johns Hopkins Hospital*, 330 Md. 53, 66–67, 622 A.2d 128, 135 (1993).