2025 IL App (4th) 240593

NO. 4-24-0593

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ALADDIN DONNELL, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Peoria County |
| v. | ) | No. 20L24 |
| | ) | |
| RYAN N. NOLTE, M.D.; OSF MULTI-SPECIALTY | ) | |
| GROUP, an Illinois Corporation, d/b/a OSF Vascular | ) | |
| Institute; OSF HEALTHCARE CARDIOVASCULAR | ) | |
| INSTITUTE, an Illinois Corporation; OSF MEDICAL | ) | |
| GROUP, an Illinois Corporation; ROBERT L. KING, | ) | |
| M.D.; CENTRAL ILLINOIS RADIOLOGICAL | ) | |
| ASSOCIATES LTD., an Illinois Corporation; OSF | ) | |
| HEALTHCARE SYSTEM, an Illinois Corporation; and | ) | |
| OSF SAINT FRANCIS MEDICAL CENTER, PEORIA, | ) | Honorable |
| an Illinois Corporation, | ) | Stewart James Umholtz, |
|     Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Justices Zenoff and Lannerd concurred in the judgment and opinion.

**OPINION**

¶ 1 In January 2020, plaintiff, Aladdin Donnell, brought this negligence action against defendants, Ryan N. Nolte, M.D.; OSF Multi-Specialty Group, d/b/a OSF Vascular Institute; OSF Healthcare Cardiovascular Institute; OSF Medical Group; Robert L. King, M.D.; Central Illinois Radiological Associates Ltd. (CIRA); OSF Healthcare System; and OSF Saint Francis Medical Center, Peoria (OSF Saint Francis). Dr. Robert King and CIRA—Dr. King's then-employer—filed a motion for summary judgment, which the circuit court granted. On appeal, plaintiff argues the court erred in granting summary judgment when it (1) decided no

physician-patient relationship existed, (2) did not view the facts in a light most favorable to plaintiff, and (3) found as a matter of law that public policy did not favor plaintiff. We find no genuine issue of material fact existed to preclude summary judgment and affirm the circuit court's judgment.

¶ 2                                    I. BACKGROUND

¶ 3         Plaintiff underwent shoulder surgery and subsequently developed blood clots in his leg. He was transferred to another hospital, wherein he received a procedure to prevent the blood clots from travelling to his heart or lungs. He was then transferred to another hospital, where codefendant Dr. Nolte treated plaintiff for his blood clots. Dr. Nolte had conferred with codefendant Dr. King about plaintiff's condition and whether a thrombolysis procedure would be appropriate for plaintiff. Both Drs. Nolte and King were noted as agreeing that an anticoagulation medication therapy was an appropriate treatment for plaintiff's blood clots. Plaintiff later developed complications due to the blood clots and filed a negligence action against defendants. Dr. King and CIRA moved for summary judgment, arguing plaintiff failed to establish a physician-patient relationship between himself and Dr. King. The circuit court granted Dr. King's motion.

¶ 4         The following facts were established from depositions and exhibits filed in connection with the motion for summary judgment.

¶ 5                            A. Depositions and Medical Records

¶ 6         Central to the dispute between the parties in this case are medical notes from February 2, 2018. An "interdisciplinary" note, time stamped "2/2/2018 5:18 AM," states:

> "Pt irritable throughout the night ice packs placed on right
>
> shoulder per pts request due to recent right shoulder rotator cuff

surgery. Pt given pain medication at begining [*sic*] of shift but has not had complaints of pain until the morning. Percocet given for pain and order received for morphine 3mg 1 time dose given iv. Pt requested a 2nd opinion from another doctor and possible transfer to Carl [*sic*] Hospital due to conflicting plans from hospitals on treatment course. Doctor Nolte notified of pt's request. Pt notified that Dr. Nolte will talk to him this morning when he comes in to help assist him further in his decision process pt states he was told he would be discharging today and is afraid it would be too soon and wants surgery for [deep vein thrombosis (DVT)] in LLE."

A "Discharge Summary" note, time stamped "2/2/2018 9:44 AM," states:

"[Plaintiff] was transferred for consideration of DVT lysis.

We reviewed his images and felt that he was most appropriate for first line therapy. Xarelto for minimum 3 months of treatment (can defer to Dr. Vanle [*sic*] for further recommendations at his outpatient follow up for duration).

The patient wanted a second opinion so we also discussed with Dr. King. He was of the same opinion that this patient was best to have first line therapy.

We recommend that the [inferior vena cava (IVC)] filter be removed in 6-8 weeks. I have updated Dr. Vanle [*sic*] of such. He will have a follow up venous duplex and follow up with Dr. Vanle [*sic*]."

¶ 7                                1. *Plaintiff*

¶ 8    On January 26, 2018, plaintiff underwent shoulder surgery, performed by Dr. Joseph Norris at Gibson Area Hospital. Following the surgery, plaintiff reported to the Gibson Area Hospital emergency room due to pain in his leg. Plaintiff was transported to OSF St. Joseph Medical Center (OSF St. Joseph) in Bloomington, Illinois, for further care.

¶ 9    Upon arriving to OSF St. Joseph, Dr. Jesse Van Le informed plaintiff he had a "massive amount of blood clots from [his] groin to [his] foot." Dr. Van Le informed plaintiff that OSF St. Joseph "[did] not have the equipment to go into [his] leg and dissolve" the clots, so he would be sent to OSF Saint Francis in Peoria, Illinois, where such a procedure could be done.

¶ 10    Plaintiff did not recall his time at OSF Saint Francis, other than his final interaction with Dr. Nolte, wherein he was told he would not undergo a procedure for his blood clots. Plaintiff was prescribed medication for the clots and released from the hospital. He subsequently experienced complications due to the blood clots that persist to this day.

¶ 11                                2. *Dr. Van Le*

¶ 12    Dr. Van Le stated he consulted with plaintiff regarding a DVT in his left leg. Dr. Van Le's medical notes from February 1, 2018, state:

> "Discussed at length with [plaintiff] and wife today regarding DVT. *** Due to large thrombus load, acute nature of DVT, [plaintiff] will most likely benefit from IVC filter placement and thrombolysis. Thrombolysis would reduce risk of future post thrombophlebitic syndrome. IVC filter can be placed here. However, thrombolysis would need to be performed at [OSF Saint Francis]."

¶ 13    Dr. Van Le explained post-thrombophlebitic syndrome is "a syndrome of swelling

of the leg, leg pain, heaviness." Dr. Van Le performed an IVC filter placement procedure to prevent the clots from reaching the heart or lungs. However, IVC filter placement does not treat DVT. Dr. Van Le did not himself perform the thrombolysis procedure, so he arranged for plaintiff to be transferred to OSF Saint Francis to see Dr. Nolte, who did perform thrombolysis. Dr. Van Le stated his referral was for Dr. Nolte to evaluate if plaintiff was a candidate for the thrombolysis procedure.

¶ 14                                    3. *Dr. Nolte*

¶ 15          Dr. Nolte first learned about plaintiff when Dr. Van Le called OSF Saint Francis. It was Dr. Nolte's understanding that plaintiff "had an IVC filter placed, had a DVT, and wanted to be transferred for consideration of thrombolysis." Dr. Nolte testified he did not believe plaintiff "was a candidate for thrombolysis" and treated plaintiff's DVT with anticoagulation medication as a "first line" therapy.

¶ 16          Dr. Nolte did not recall speaking with Dr. King regarding plaintiff's condition. Dr. Nolte stated he did not regularly consult with Dr. King regarding patients. Dr. Nolte stated Dr. King was a colleague who was also capable of performing thrombolysis procedures. Dr. Nolte recalled Dr. King was the on-call interventional radiologist at the time of plaintiff's treatment. Dr. Nolte testified the interventional radiologist group at OSF Saint Francis "also performed" the thrombolysis procedure and that he "wanted to have them review it to see if they thought that it would—yeah, to see if they would want to perform that procedure." When asked if he was seeking someone else to perform the procedure on plaintiff, Dr. Nolte said, "not necessarily." Dr. Nolte confirmed he was not seeking a consultation with an interventional radiologist to perform the thrombolysis procedure. Dr. Nolte stated he asked nurse Miranda Kennedy to "obtain an opinion from the interventional radiologist group." Dr. Nolte again did

not recall if he spoke directly with Dr. King.

¶ 17 Dr. Nolte did not recall if Dr. King saw plaintiff or reviewed any of plaintiff's medical records. When asked if he understood what the term "curbside consultation" meant, Dr. Nolte described it as "[a] request for a medical opinion without knowing the specific patient." When asked if Dr. King had performed a curbside consultation regarding plaintiff, Dr. Nolte said, "I'm not sure." Dr. Nolte stated he was capable of performing the thrombolysis procedure if he found such a procedure was appropriate for plaintiff. Regarding the discharge summary, Dr. Nolte did not recall if the use of "we" was written by himself or Kennedy.

¶ 18 4. *Nurse Kennedy*

¶ 19 Kennedy did not recall speaking with Dr. King about plaintiff and did not recall any conversation between Dr. Nolte and Dr. King regarding plaintiff. She was familiar with the term "curbside consult." It was her understanding that typically a formal consultation required an order in the patient's chart.

¶ 20 Kennedy testified it was "very possible" she authored the discharge summary note in plaintiff's medical record. Dr. Nolte would have been able to later review and make edits as he saw fit. Regarding the use of "we" in the discharge summary, Kennedy stated she did not have the appropriate training to review or perform certain tests as discussed in the note and that such things would fall under the purview of a physician. She could not recall which parts of the medical notes she authored or which parts Dr. Nolte authored.

¶ 21 5. *Dr. King*

¶ 22 Dr. King denied seeing plaintiff on February 2, 2018, or ever reviewing plaintiff's medical records. Dr. King did not recall any conversation about plaintiff with Dr. Nolte. When asked about the discharge summary stating he agreed with Dr. Nolte's assessment of plaintiff's

treatment plan, Dr. King stated he did not recall agreeing with Dr. Nolte. Dr. King did not recall giving any opinion to Dr. Nolte regarding plaintiff.

¶ 23 Dr. King agreed that OSF Saint Francis's rules and regulations required a consultation when requested by the patient. Dr. King responded that he was not aware plaintiff had requested a second opinion and he would have relied on the referring physician to request the consultation.

¶ 24 B. Summary Judgment

¶ 25 In March 2023, Dr. King and CIRA filed a motion for summary judgment. The motion argued Dr. King merely provided Dr. Nolte with a "brief informal opinion or 'curbside consult' " regarding plaintiff. As such, plaintiff could not establish a physician-patient relationship with Dr. King to satisfy the necessary element of a duty owed to plaintiff sufficient for a negligence claim. The matter proceeded to a hearing in October 2023.

¶ 26 The circuit court stated as follows:

"[T]he court's reviewed the motion and the response and reply. Seems—to the court it seems rather clear based upon all the evidence that's been presented that even construing the evidence in the light most favorable to the plaintiff, there's no question.

There's no physician-patient relationship that is demonstrated by the facts in this case; therefore, there's no duty that arises. In particular there's no formal consult order in the medical record by Mr. [*sic*] Nolte. And it's important, I think, to note that Dr. King does not appear in the audit trail for the medical records.

The court agrees with the defendant that we have unrebutted

- 7 -

testimony or evidence that the defendant, Dr. King, never saw this patient, never consulted with regard to this patient because there's nothing in the medical record to document that, never reviewed the medical records. We can document that because he's not in the audit trail. And he never—this doctor never personally entered anything into this patient's medical records."

¶ 27 The circuit court granted defendants' motion. In November 2023, plaintiff filed a motion to reconsider, which the court denied in March 2024.

¶ 28 This appeal followed.

¶ 29 II. ANALYSIS

¶ 30 On appeal, plaintiff argues that the circuit court erred when it (1) decided no physician-patient relationship existed, (2) did not view the facts in a light most favorable to plaintiff, and (3) found as a matter of law that public policy did not favor plaintiff.

¶ 31 A. Standard of Review and Applicable Law

¶ 32 This court recently addressed the issue of summary judgment, as it pertains to the physician-patient relationship, in *Blagden v. McMillin*, 2023 IL App (4th) 220238, ¶¶ 38-40, stating:

"Summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that (1) there is no genuine issue of material fact and (2) the moving party is entitled to judgment as a matter of law. [Citation.] The purpose of summary judgment is not to try an issue of fact but to determine whether a

- 8 -

genuine issue of material fact exists. [Citation.]

When determining whether a genuine issue of material fact exists, the court must construe all pleadings and attachments strictly against the moving party and liberally in favor of the nonmoving party. [Citation.] A triable issue exists when there is a dispute concerning material facts or when those facts are undisputed but reasonable persons might draw different inferences from them. [Citation.] Summary judgment is a drastic means of disposing of litigation and, therefore, should only be allowed when the right of the moving party is clear and free from doubt. [Citation.] Whether a duty of care exists is a question of law to be determined by the court and thus may be determined on a motion for summary judgment. [Citation.]

A trial court's ruling on a motion for summary judgment is reviewed *de novo*. [Citations.] The term *de novo* means that the court reviews the matter anew—the same as if the case had not been heard before and as if no decision had been rendered previously. [Citation.] Where, as here, the issues are all reviewed *de novo*, we perform the same analysis a trial court would perform and give no deference to the judge's conclusions or specific rationale." (Internal quotation marks omitted.)

¶ 33    Regarding a physician's duty of care, we explained:

"In a medical negligence action, a plaintiff must prove a duty

owed by the defendant physician to the plaintiff, a breach of that duty, an injury proximately caused by the breach, and resultant damages. [Citation.] A physician's duty arises only when a physician-patient relationship has been expressly established or there is a special relationship such as when one physician is asked by another physician to provide a service to the patient, conduct laboratory tests, or review test results." *Id.* ¶ 42.

Additionally, we stated:

"Illinois law is well settled that the special relationship giving rise to a duty of care may exist even in the absence of any meeting between the physician and the patient where the physician performs specific services for the benefit of the patient. [Citation.] A physician-patient relationship is established where the physician takes some affirmative action to participate in the care, evaluation, diagnosis or treatment of a specific patient. [Citation.] The central inquiry is whether the physician has been asked to provide a specific service for the benefit of a specific patient [citation], such as conducting laboratory tests, reviewing the patient's test results, directing the treating physicians in their care of the patient, or otherwise knowingly accepting the patient as his or her patient. [Citation.] Merely dispensing medical advice or offering a professional opinion in response to an inquiry from the patient's treating physicians is not sufficient to create a duty..]" (Internal

quotation marks omitted.) *Id.* ¶ 43.

¶ 34                                             B. Other Cases

¶ 35          Plaintiff primarily points to three cases in support of his arguments regarding the

establishment of a physician-patient relationship: *Bovara v. St. Francis Hospital*, 298 Ill. App. 3d

1025 (1998), *Slanger v. Advanced Urgent Care, Ltd.*, 2022 IL App (1st) 211579, and *Blagden*.

We review those now.

¶ 36          In *Bovara*, Albert Bovara was seen by Dr. Pascale, a cardiologist, because of a

heart condition. *Bovara*, 298 Ill. App. 3d at 1027. Bovara gave Dr. Pascale an angiogram test

result that was conducted at another hospital after he had suffered a heart attack. *Id.* "Dr. Pascale

was not trained in reading angiograms and did not perform angioplasty." *Id.* The angiogram was

forwarded to two cardiac interventionists at the hospital for review. *Id.* According to Dr. Pascale,

the interventionist determined whether a patient should undergo angioplasty. *Id.* The cardiac

interventionists reviewed Bovara's angiogram, discussed his case with Dr. Pascale, and informed

Dr. Pascale that he was a candidate for angioplasty. *Id.* at 1027-28. Another surgeon began

Bovara's angioplasty because one of the cardiac interventionists was delayed. Bovara died

during the procedure. *Id.* at 1028-29. The circuit court granted summary judgment for the cardiac

interventionist defendants, finding no physician-patient relationship. *Id.* at 1029.

¶ 37          The appellate court reversed, finding genuine issues of material fact existed as to

whether there had been a physician-patient relationship between Bovara and the cardiac

interventionists. *Id.* at 1033. The *Bovara* court noted Dr. Pascale was not qualified to review

Bovara's angiogram or recommend the angioplasty procedure. *Id.* at 1031. The cardiac

interventionists should have known their recommendation to Dr. Pascale would be passed on to

Bovara. *Id.* Indeed, the cardiac interventionists were employed and compensated by the hospital

- 11 -

to consult with treating physicians such as Dr. Pascale for the purpose of determining if surgical intervention was warranted. *Id.* The *Bovara* court found the cardiac interventionists were more involved with Bovara's treatment than simply reviewing the angiogram. *Id.* at 1032.

¶ 38    In *Slanger*, Janet Slanger visited the emergency room, complaining of a sore throat and difficulty breathing. *Slanger*, 2022 IL App (1st) 211579, ¶ 5. A nurse practitioner examined Slanger and diagnosed her with "pharyngitis, left cervical lymphadenopathy, and stomatitis." *Id.* ¶ 6. The nurse practitioner prescribed the antibiotic Clindamycin for Slanger's symptoms and instructed her to follow up with her primary care physician. *Id.* Dr. Collins, the attending physician supervising the emergency room, and the nurse practitioner reviewed the plaintiff's medical chart, history, examination, and lab results and determined that the nurse practitioner provided " 'reasonably appropriate' " medical care. *Id.* Shortly after being discharged from the emergency room, Slanger called 911, was found unresponsive at her home, and subsequently died following unsuccessful emergency measures. *Id.* ¶ 7. The circuit court granted summary judgment in favor of Dr. Collins, finding he owed no duty of care to Slanger. *Id.* ¶ 10.

¶ 39    The appellate court reversed, finding Dr. Collins " 'sign[ed] off' " on the nurse practitioner's treatment of Slanger. *Id.* ¶ 20. Dr. Collins testified during his deposition that Slanger could not be discharged unless he approved of the nurse practitioner's decision to discharge her. *Id.* Slanger signed a consent form for care stating she was " 'under [the] control' " of the attending physician, which was Dr. Collins. *Id.* ¶ 21. Therefore, the court determined there was a genuine issue of material fact as to whether Dr. Collins owed Slanger a duty of care. *Id.* ¶ 25.

¶ 40    In *Blagden*, Dennis Blagden went to the hospital complaining of neck pain, a bug

bite on his elbow, and elbow swelling. *Blagden*, 2023 IL App (4th) 220238, ¶ 17. He was treated by Dr. McMillin for a possible infection. *Id.* ¶ 18. He was eventually diagnosed with a muscular condition, but his symptoms persisted. *Id.* ¶ 19. Dr. McMillin contacted the on-call physician, Dr. Krock. *Id.* ¶ 20. Dr. McMillin did not have admitting authority at the hospital and spoke with Dr. Krock for the express purpose of determining whether to hospitalize Blagden. *Id.* ¶ 21. Dr. McMillin testified he would not have consulted with Dr. Krock if he had intended to release Blagden. *Id.* Dr. Krock did not recall discussing Blagden with Dr. McMillin, but Dr. McMillin recalled discussing the hospitalization of Blagden with Dr. Krock and that Dr. Krock did not believe he should be admitted to the hospital that evening. *Id.* ¶¶ 23, 25. Blagden was released from the hospital and would later return in respiratory failure and sepsis, and he subsequently died after being transferred to another hospital. *Id.* ¶ 30. The circuit court granted Dr. Krock summary judgment. *Id.* ¶ 32.

¶ 41        This court reversed, finding it was error for the circuit court to grant Dr. Krock's summary judgment motion. *Id.* ¶ 60. We noted that Dr. Krock was the on-call physician assigned to consult with Dr. McMillin, was compensated for this service, consulted with Dr. McMillin for Blagden's benefit, received specific information about Blagden and reviewed his tests, collaborated with Dr. McMillin, was ultimately responsible for determining whether Blagden would be hospitalized, and determined he should not be hospitalized. *Id.* We specifically identified two critical facts: (1) Dr. Krock collaborated with Dr. McMillin on Blagden's treatment recommendations and (2) Dr. Krock, ultimately, possessed the authority to admit Blagden to the hospital. *Id.* ¶¶ 61-62.

¶ 42                                    C. This Case

¶ 43        Plaintiff argues, like in *Bovara*, Dr. King was consulted by Dr. Nolte for the

specific purpose of providing a second opinion as to the course of treatment for him. Like in *Slanger*, Dr. King "signed off" on Dr. Nolte's medical plan for plaintiff. And, like in *Blagden*, Dr. Nolte sought a second opinion from Dr. King in conformity with the hospital rules and regulations because plaintiff requested a second opinion. We disagree.

¶ 44 We find this case to be distinguishable from *Bovara*, *Slanger*, and *Blagden*. Our review of the record shows Dr. King's only involvement in this matter comes from the discharge summary. It certainly may be the case that OSF Saint Francis's rules and regulations require a formal consultation when a patient requests a second opinion like plaintiff did. However, the record does not support anything resembling a physician-patient consultation having occurred between Dr. King and plaintiff. It is clear plaintiff was not satisfied with receiving the more conservative treatment of anticoagulation medication and being discharged. The fact that Dr. Nolte discussed the matter in some fashion with Dr. King does not mean that Dr. King collaborated with Dr. Nolte or had any persuasive authority over Dr. Nolte. Dr. King did not have any special admitting privileges above Dr. Nolte. There is no evidence Dr. King billed plaintiff, or anyone for that matter, for reviewing or otherwise discussing plaintiff's condition with Dr. Nolte. If Dr. Nolte had decided a thrombolysis procedure was appropriate for plaintiff, Dr. Nolte would have performed it, not Dr. King. Dr. King had no future ties to plaintiff following his discharge. In fact, Dr. Nolte referred plaintiff back to Dr. Van Le. Perhaps most critical in this determination is that the audit trails for OSF Saint Francis's medical records show Dr. King never reviewed any of plaintiff's medical records; that is, Dr. King did not review any of plaintiff's medical history or test results, which is a commonality shared by the cases finding a genuine issue of material fact as to the physician-patient relationship.

¶ 45 In *Mackey v. Sarroca*, 2015 IL App (3d) 130219, ¶ 26, the appellate court

explained:

> "[A] special relationship establishing a physician-patient relationship exists where, as in *Bovara*, and [*Lenahan v. University of Chicago*, 348 Ill. App. 3d 155 (2004)], the consulting physician is assigned the task of consulting as part of established procedures, protocols or contractual obligation with the hospital, is compensated for those consulting services, orders tests or reviews test results, gives specific medical advice regarding contemporaneous patient care, and makes decisions regarding the patient's current medical care. [Citations.] However, where a physician is consulted or advice is sought on an informal basis, where no compensation is received by the consulting physician, and the consulting physician does not order tests or review test results and has no input in the actual treatment of the patient, no special relationship creating a physician-patient relationship has been established."

¶ 46    This case is one where the consulted physician did not order or review test results, did not participate in the treatment plan, and was apparently sought on an informal basis for advice. Accordingly, we find the circuit court did not err when it determined there was no physician-patient relationship between Dr. King and plaintiff. Where Dr. King owed no duty to plaintiff, his employer cannot also be held vicariously liable by extension.

¶ 47    We need not address plaintiff's argument that the circuit court failed to view the facts in a light most favorable to him when it granted the summary judgment motion. The fact

- 15 -

that our review of the facts, with no deference to the court's ruling and in a light most favorable to plaintiff, found no physician-patient relationship between Dr. King and plaintiff renders any propounded shortcomings in the court's determination moot. See *Cornerstone Bank & Trust, N.A. v. Consolidated Grain & Barge Co.*, 2011 IL App (4th) 100715, ¶ 24 ("In determining whether the trial court reached the proper result, we need not confine ourselves to the court's rationale but may instead affirm the grant of summary judgment on any basis supported by the record.").

¶ 48        Plaintiff argues that public policy concerns support finding the circuit court erred because Dr. King was asked to provide a second opinion for the benefit of plaintiff and provided a medical opinion such that this fact pattern should warrant a special relationship. In *Blagden*, we said "public policy should encourage informal consultations between physicians" but "must not ignore actual physician involvement in decisions that directly affect a patient's care." *Blagden*, 2023 IL App (4th) 220238, ¶ 70. We stand by this public policy sentiment now and find nothing about the facts of this case contradicts such a view. The record demonstrates Dr. Nolte sought an informal consultation with Dr. King. The fact plaintiff may have desired a formal consultation with another physician when requesting a second opinion and Dr. Nolte failed to accommodate that second opinion as plaintiff had contemplated does not manifest Dr. King's communications with Dr. Nolte into something more. The fact Dr. King performed the singular act of giving some medical advice to Dr. Nolte does not create a physician-patient relationship between Dr. King and plaintiff. See *Estate of Kundert v. Illinois Valley Community Hospital*, 2012 IL App (3d) 110007, ¶ 28. Accordingly, we find the facts of this case do not contravene public policy.

¶ 49        Lastly, during and following oral arguments for this case, it has become clear to this court that counsel for plaintiff has misrepresented the record on appeal. First, we note that

counsel rearranged Dr. Nolte's discharge summary to suggest to this court that Dr. Nolte's use of "we" in the phrase "[w]e reviewed his images" occurred after plaintiff was documented to have requested a second opinion and Dr. Nolte was documented to have conferred with Dr. King. Counsel stated to this court the order of Dr. Nolte's discharge summary was "irrelevant." Second, the appellant's brief states, "Dr. King is documented to have signed off on the medical plan for [plaintiff]." When asked specifically where this documented evidence was in the record, counsel stated this sentence was a "colloquial" expression. We would never seek to discourage attorneys from zealously advocating for their clients. See *First Federal Savings Bank of Proviso Township v. Drovers National Bank of Chicago*, 237 Ill. App. 3d 340, 347 (1992) ("This court does not mean to discourage attorneys from zealously representing their clients or from bringing appeals that have even arguable merit."). However, counsel is not permitted to affirmatively misrepresent facts to this court. See Ill. R. Prof'l Conduct (2010) R. 8.4(c) (eff. July 1, 2024) ("It is professional misconduct for a lawyer to *** engage in conduct involving *** misrepresentation."); Ill. R. Prof'l Conduct (2010) R. 3.3(a)(1) (eff. Jan. 1, 2010) ("A lawyer shall not knowingly *** make a false statement of fact or law to a tribunal ***."); see also Ill. R. Prof'l Conduct (2010) R. 3.3 cmt. 3 (eff. Jan. 1, 2010) ("There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."). Therefore, we admonish counsel for misrepresenting the record on appeal in appellant's brief.

¶ 50                                III. CONCLUSION

¶ 51          For the reasons stated, we affirm the circuit court's judgment.

¶ 52          Affirmed.

- 17 -

*Donnell v. Nolte*, 2025 IL App (4th) 240593

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 20-L-24; the Hon. Stewart James Umholtz, Judge, presiding. |
| **Attorneys for Appellant:** | Shawn S. Kasserman and Loren M. Legorreta, of Tomasik Kotin Kasserman, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Adam P. Chaddock and Samuel J. Perkins, of Quinn Johnston, of Peoria, for appellees. |